## THE KATIE O'NEIL.

### BLACK DIAMOND COAL CO. v. O'NEIL.

(District Court, N. D. California. December 13, 1894.)

#### No. 11,065.

**1. ADMIRALTY—ENFORCEMENT OF CLAIMS ON MORTGAGES.**

Though a court of admiralty has no jurisdiction to entertain independent actions to foreclose mortgages upon vessels, yet, when such court has a fund to dispose of arising from the sale of a vessel, it may entertain claims based on mortgages, pass on their validity and priority, and order them to be satisfied out of the fund, subject to the precedence of all maritime liens and the superior equities of liens and claims other than maritime.

**2. SAME—PRIORITIES.**

O., the owner of a steam tug, had a running account with the P. Co. for advances and supplies, to secure which, with future advances and credits, he gave his note for $3.000, secured by a mortgage on the tug. Subsequently he gave a second mortgage on the tug to one B. for advances and supplies. O. made payments from time to time to the P. Co., which called upon him for such payments whenever the amount of his account exceeded

the amount of the mortgage security. When the P. Co. first learned of the mortgage to B., O.'s account exceeded the security by $612.74, and the P. Co. afterwards made further advances to the amount of $2,244. The tug having been libeled by another party, and sold, and a surplus remaining in court, claims were presented by the P. Co. and B. *Held* that, as to the advances made by the P. Co. after it learned of B.'s mortgage, its claim was inferior to the equities in favor of B.

**8. SAME—APPLICATION OF PAYMENTS.**
O. made two payments to the P. Co., after it learned of the mortgage to B., of $2,377.12 and $300 respectively. The Civil Code of California, where the transactions were had, provides that, in case of application of payments by the court, payment shall be made "* * * (3) of the obligation earliest in date of maturity; (4) of an obligation not secured * * *; (5) of an obligation secured * * *." *Held*, no application having been made by either party, that, in accordance both with this statute and with general equitable principles, the payments made by O. to the P. Co. should be applied, first, to the part of his indebtedness remaining unsecured when the P. Co. learned of the mortgage to B., and then to the reduction of the secured debt.

This was a libel by the Black Diamond Coal Company against the steam tug Katie O'Neil, Patrick O'Neil, claimant. The tug was sold and a surplus remained in the registry of the court. The Pacific Marine Supply Company and William J. Brady file petitions against such surplus.

Petitions against the remainder of proceeds in the registry of the court for supplies furnished and labor done to the tug Katie O'Neil, and for the liquidation of a first and second mortgage given upon the tug to secure debts due and to become due.

M. L. Gerstle and Warren Gregory, for petitioner Pacific Marine Supply Co.

Reddy, Campbell & Metson, for petitioner William J. Brady.

MORROW, District Judge. This case now involves the petitions of the Pacific Marine Supply Company and of William J. Brady against the proceeds of sale of the steam tug Katie O'Neil. The claim of the libelant, the Black Diamond Coal Company, and those of several others who intervened, have been previously adjudicated. The claims of the two petitioners above referred to come now before the court on exceptions to two reports filed by the commissioner to whom the above claims were referred for proof. The questions raised by these exceptions involve the priority and liquidation of certain claims made upon the remainder of the proceeds in the registry of the court derived from the sale of the steam tug Katie O'Neil. These claims are as follows: (1) By the Pacific Marine Supply Company, for supplies furnished to the tug, and alleged to constitute a lien, under the state statute, amounting to $1,107.82. Of this sum the commissioner allowed $196.70 for coal furnished for the use of the Katie O'Neil. The proof, as to all the other items alleged to have been furnished for the use of the tug, does not satisfactorily establish the claim that the supplies were in fact for the use of that vessel. (2) By William J. Brady, for materials supplied and labor done to the tug, amounting to $42.20, of which the commissioner allowed the sum of $35.20, the difference of

$7 being for an item that was furnished more than a year before suit, and was barred, therefore, by the state statute under which the lien was claimed. No exception was taken to this allowance, and the report of the commissioner in that respect should be confirmed, the charges appearing to be proper and reasonable. (3) A claim for $3,000, by the Pacific Marine Supply Company as the holder of a note and mortgage for that amount, given by Patrick O'Neil, with the tug as security, on April 29, 1893. (4) A claim for $1,320.58, by William J. Brady as the holder of a note and mortgage in that sum, given also by Patrick O'Neil, with the tug as security, on July 21, 1893, and constituting a second mortgage on that vessel.

With respect to the claims made against the proceeds to satisfy these two mortgages, it is now indisputable law that this court, as a court of admiralty, would have no jurisdiction to entertain independent actions brought to enforce or foreclose mortgages given upon vessels. The John Jay, 17 How. 399. But, when the court has a fund to dispose of, as in this case, it may entertain claims based on mortgages, pass upon their validity and priority, and order such to be satisfied out of the fund in the hands of the court, subject, however, to the paramount precedence of all maritime liens, and the superior equities of liens and claims other than maritime. The Angelique, 19 How. 239; The Lottawanna, 21 Wall. 558; The Island City, 1 Low. 375.[1] The sum realized from the sale of the tug was $5,200. Of this amount, after satisfying the claim of the libelant and several interveners, there remains in the registry the sum of $2,317.46. This amount being insufficient to liquidate in full all of the four claims above referred to, it therefore becomes important to determine which of the claims are entitled to priority, and in what amount. As to the two claims for supplies, materials, and labor, no difficulty arises. They are undoubtedly entitled to preference over the mortgages. The contention is with respect to the latter, and it concerns, not so much the priority, as between themselves, of the two mortgages, as it does the application to be made by the court of two payments given by O'Neil, the owner of the tug, upon the running account for advances and supplies which the first mortgage held by the Pacific Marine Supply Company was designed to secure.

The exceptions to the reports of the commissioner are taken by William J. Brady, holder of the second mortgage. He excepts, first, because the commissioner allowed $196.70 for coal furnished the tug; whereas, it is claimed, he should have found that there was nothing due the Pacific Marine Supply Company for supplies. Secondly, he excepts because the commissioner has not found or reported to the court how much, if anything, is now due and unpaid on the note and mortgage held by the Pacific Marine Supply Company on the tug; whereas, it is claimed, the commissioner should have found that said note and mortgage have been fully paid off and discharged as against the subsequent mortgagee, William J. Brady. Thirdly, he further excepts because the commissioner has not found how much, if anything, is now due and unpaid on the note and mortgage held by

[1] Fed. Cas. No. 7,109.

William J. Brady; whereas, it is claimed, he should have found that the whole amount of said note and mortgage is still due and unpaid.

As to the first exception, which is directed to the allowance of $196.70 for coal, the report of the commissioner should be confirmed. The aggregate of the claims for supplies alleged to have been furnished to the tug by the Pacific Marine Supply Company, and included in their petition against the proceeds, amounts to $1,107.82. The commissioner reported in favor of one item only, and then but for one-half of the amount claimed. He reported the sum of $196.70 as being justly due. This was for coal furnished to the tug and actually consumed by her. While the testimony tends to show that all the coal for which a claim is made was furnished by the company, the evidence of Capt. O'Neil, the owner, established the fact that but one-half of it was used by the tug itself. Therefore, obviously, a lien for but one-half of that quantity could be impressed on the tug or collected from the proceeds of sale. The remaining items included in this claim may be dismissed with the observation that the proof of their being furnished for the use of, and being actually used by, the tug, is too insufficient to justify the vesting of a maritime lien.

The remaining two exceptions will have to be disposed of together. They involve the important question of this case, which is one essentially of the application to be made by the court of two payments by O'Neil upon the running account he had with the Pacific Marine Supply Company for advances and supplies furnished to the tug, which account was secured to the extent of $3,000 by O'Neil's individual note in that sum and by a mortgage on the tug. A statement of the leading facts is necessary to convey a proper understanding of the law applicable thereto. Patrick O'Neil was the sole owner of the steam tug Katie O'Neil. He had a running account with the Pacific Marine Supply Company, commencing March 17, 1893, and continuing until about the end of that year, for advances in cash and supplies and merchandise furnished for the alleged use of the tug in, and incidental to, her employment of towing barges to and from certain quarries and conveying merchandise and supplies to those places. O'Neil made payments on this running account from time to time. A copy of the account was introduced in evidence and marked "Exhibit A." It shows the various sums advanced and the amounts charged for merchandise furnished to Capt. O'Neil for the alleged use and benefit of the tug, and also the several credits made by the latter. To secure the Pacific Marine Supply Company on this running account, Capt. O'Neil, on April 29, 1893, gave his note to the company for $3,000, and mortgaged the tug to them as security therefor. The mortgage was duly recorded on that day at the customhouse in San Francisco. It was testified that the consideration for this note and mortgage was $2,000 in cash and a further credit of $1,000. Practically speaking, it was for debts due and to become due. The note recited that it was due in four months from date (April 29, 1893), and that it bore interest at 1 per cent. per month. On July 21, 1893, Patrick O'Neil gave a second mortgage on the tug to William J. Brady for

$1,320.58, to secure his note for that sum, payable November 30, 1893. This mortgage was also duly recorded in the customhouse. The consideration was $500 in cash, and $820.58 for labor performed and materials furnished to the tug. The Pacific Marine Supply Company, holder of the first mortgage, had no notice of the existence of the second mortgage until about October 28, 1893. On the other hand, Brady claims that he did not know of the first mortgage when he took his mortgage to secure O'Neil's note for $1,320.58. Capt. O'Neil says he cannot state whether he informed Brady of the first mortgage on the tug, and Brady displays an equal uncertainty of recollection, and seems to have contented himself with referring the matter to his attorneys for investigation, and cannot now say whether he ever received any reply from them on the subject. The recording of the first mortgage was, however, constructive notice to all subsequent incumbrancers, and Brady, therefore, took his mortgage subject to the prior lien. At the time when the Pacific Marine Supply Company first became aware of Brady's mortgage, which, as stated, was about October 28, 1893, the account of O'Neil with the company showed a total indebtedness of $14,697.19, upon which payments had been made to the amount of $11,084.45, leaving a balance due of $3,612.74. This amount, it will be observed, was $612.74 in excess of the mortgage security of $3,000, and hence this balance of $612.74 was, on October 28, 1893, an unsecured indebtedness in that amount. Subsequent to the 28th of October, 1893, when the Pacific Marine Supply Company received notice of Brady's mortgage, the company continued to make advances and to furnish merchandise. These advances reached the further or additional sum of $1,988.75 on December 11, 1893, when O'Neil made the next payment of $2,377.12; and $2,244 on January 6, 1894, when he made the final payment of $300 upon the account. With respect to these additional advances of money and charges for merchandise furnished subsequent to the notice of October 28, 1893, I find no difficulty in determining that they stand. in this account with O'Neil, inferior to the equities in favor of the claim of Brady under his second mortgage. Tapia v. Demartini, 77 Cal. 383, 19 Pac. 641.

We come now to the real question in controversy. As before stated, O'Neil made two payments to the Pacific Marine Supply Company subsequent to October 28, 1893. The first, on December 11, 1893, was for $2,377.12, and the other, on January 6, 1894, was for $300. Together they aggregate $2,677.12. It is with the application, to be made on this account, of these payments, that the question of difficulty arises. O'Neil made no specific application of these payments to the extinction of any particular debt or debts. But evidence was introduced upon the hearing of the exceptions tending to show that the creditor did make an appropriation of these payments, and that such was made by it with a view of extinguishing that portion of the running account which exceeded the amount of the security of $3,000. In other words, that the creditor applied the payment of $2,377.12 on December 11, 1893, first to the unsecured portion of the running account, amounting to $612.74, and the balance of $1,764.38 on the secured portion of $3,000. The secretary of

the company testified that when the debts exceeded the amount of the collateral, viz. $3,000, payment was urged, and that the account be reduced to the amount of the mortgage.    It frequently happened that the account exceeded the sum of $3,000, whereupon a demand was made upon O'Neil that he should pay money and reduce the indebtedness in excess of the mortgage.    O'Neil had a contract with the government, and, as he was paid by drafts on the treasury, he would turn the drafts over to the company as payments on account. The state of this account with O'Neil for the period commencing March 17, 1893, and ending October 28, 1893, was as follows:

Debit side of the account:

| | |
|---|---|
| Cash advanced | $ 9,987 80 |
| Merchandise charged | 4,599 26 |
| Interest | 110 13 |
| | $14,697 19 |

Credit by payments as follows:

| | |
|---|---|
| April 17, 1893 | $   338 74 |
| May 31, " | 1,151 06 |
| June 13, " | 1,976 03 |
| July 7, " | 1,999 99 |
| August 4, " | 1,273 14 |
| September 5, " | 2,745 49 |
| October 25, " | 1,600 00 |
| | $11,084 45 |
| Balance due | $3,612 74 |

The payments of December 11, 1893, of $2,377.12, and of January 6, 1894, of $300, were credited upon the account in the same manner as the preceding payments.    The account itself does not show that these payments were applied to the extinction of any particular debt or debts.    The two payments are simply entered in the order of their date, just as if they were credits upon the entire account, irrespective of the extent to which the indebtedness was secured.    But it was immaterial to the company whether the payments were applied to the first or last items of the account, if they were first applied to extinguish the indebtedness in excess of the security.    The mortgage was a continuing obligation, and was so treated by both parties; but whether it remained stationary, and covered only the first items of the account to the amount of $3,000, or moved up and covered later items as payments were made and applied to the first items of the account, did not concern the company in dealing with the account and its security.    In either way, the mortgage was held for the full amount of its pecuniary obligation.    The credits in the account, as they are entered, are therefore consistent with the intention of the company to apply the payments, first, to the extinguishment of the unsecured portion of the account, whether applied to the payment of the debts in the order of their priority or not.    Hence I conclude that there was an appropriation of the payments by the creditor, first, to the unsecured portion of the account, and then the balance to the account as secured by the mortgage on the tug.

But, if I am wrong in this view,—and the fact was that neither the debtor nor the creditor made any specific appropriation,—it then devolves, in accordance with the well-settled rule relating to the appropriation of payments, upon the court to do so. Cremer v. Higginson, 1 Mason, 323, Fed. Cas. No. 3,383; Stone v. Seymour, 15 Wend. 19; Field v. Holland, 6 Cranch, 8. All of the above authorities agree that the court, in the discharge of this duty, is to be governed by a sound discretion. While it is true that courts of admiralty are not courts of equity, yet whenever the ends of justice require, or the peculiar exigencies of a particular case demand it, they do not hesitate to apply equitable principles. The Eclipse, 135 U. S. 599, 608, 10 Sup. Ct. 873. In this case the equitable power in disposing of the fund may be said to be plenary, for the court, in distributing it, will seek to do full and complete justice. This proposition is well stated in National Bank, etc., v. Mechanics' Nat. Bank, 94 U. S. 439:

"The rule settled by this court as to the application of payment is that the debtor or party paying the money may, if he chooses to do so, direct its appropriation; if he fail, the right devolves upon the creditor; if he fail, the law will make the application according to its own notions of justice. Neither of the parties can make it after a controversy upon the subject has arisen between them, and a fortiori not at the trial."

But it is claimed that section 1479 of the Civil Code of this state prescribes a rule for the application of payments that must govern the court. This section, after providing that the debtor shall have the primary right of making an appropriation of payment, and, if he fail, that the creditor may then do so, reads as follows:

"If neither party makes such application within the time prescribed herein, the performance must be applied to the extinction of obligations in the following order: * * * (1) Of interest due at the time of performance; (2) of principal due at that time; (3) of the obligation earliest in date of maturity; (4) of an obligation not secured by a lien or collateral undertaking; (5) of an obligation secured by a lien or collateral undertaking."

In support of the claim of the second mortgage, it is contended that O'Neil's payments to the Pacific Marine Supply Company should be applied to the account, in accordance with subdivision 3 of the section of the Civil Code, in extinguishment of the debts in the order of their priority, the oldest being paid first. This method of appropriation, it is claimed, would leave the last items of the account unpaid and unsecured. On the other hand, it is contended, in support of the claim of the first mortgage, that the payments should be applied in accordance with the requirements of subdivisions 4 and 5 of the section; that is to say, first to the extinguishment of the debts not secured by the mortgage, and the balance to the debts so secured. This section of the Code does not appear to have been passed upon by the courts of this state with respect to the relations of these three provisions to each other. In the light of authority, a reasonable construction of these subdivisions would seem to be that subdivision 3 must govern in a case where the obligations are either secured or unsecured, and subdivisions 4 and 5 where one is secured and the other is not secured. In this view of the law, the payment of $2,377.12 on December 11, 1893, would be applied, first,

to the payment of the indebtedness of $612.74 in excess of the mortgage, leaving $1,764.38, and the payment of January 6, 1894, of $300, aggregating $2,064.38, to be applied to that portion of the account secured by the mortgage. Deducting this last amount from $3,000, the amount of the mortgage, and there would remain a balance of $935.62, for which the mortgage stands as a security.

Upon a careful consideration of the various equities existing and claimed for in this case, I think the method of applying the payments in question as here indicated is correct in principle and in accordance with the requirements of the statute. This same rule of appropriation was sanctioned by the supreme court of the United States in the case of Field v. Holland, 6 Cranch, 8. Chief Justice Marshall, in delivering the opinion of the court, thus clearly stated the equitable principle that should govern in such a case. He said:

"The principle that a debtor may control, at will, the application of his payments is not controverted. Neither is it denied that, on his omitting to make this application, the power devolves on the creditor. If this power be exercised by neither, it becomes the duty of the court; and in its performance a sound discretion is to be exercised. It is contended by the plaintiffs that, if the payments have been applied by neither the creditor nor the debtor, they ought to be applied in the manner most advantageous to the debtor, because it must be presumed that such was his intention. The correctness of this conclusion cannot be conceded. When a debtor fails to avail himself of the power which he possesses, in consequence of which that power devolves on the creditor, it does not appear unreasonable to suppose that he is content with the manner in which the creditor will exercise it. If neither party avails himself of his power, in consequence of which it devolves on the court, it would seem reasonable that an equitable application should be made. It being equitable that the whole debt should be paid, it cannot be inequitable to extinguish first those debts for which the security is most precarious. That course has been pursued in the present case."

This rule so commends itself for its fairness and equity, and, in my opinion, applies so well to the facts of the case at bar, that further citation of authority would seem to be unnecessary. It may be stated, however, that it was followed, upon the authority of Field v. Holland, in Schuelbenburg v. Martin, 2 Fed. 747, by the circuit court, as well as in other cases therein referred to. See, also, Langdon v. Bowen, 46 Vt. 512; Pierce v. Sweet, 33 Pa. St. 151; Gaston v. Barney, 11 Ohio St. 506. It is difficult to conceive of any different rule that would more nearly do justice to all concerned. It is true that, because of the inadequacy of the proceeds to answer all the proved claims, the mortgage debt of Brady will suffer to some extent; but it must be remembered that he holds a second mortgage, and that his claim is the least preferred of those now before the court. And in this respect the claim of the Pacific Marine Supply Company, as to that part of its running account subsequent to notice of Brady's mortgage, which is, confessedly, inferior to the equities of the latter's claim, is in a worse position; for the partial satisfaction of Brady's mortgage will exhaust the remainder of proceeds, and the company, therefore, will derive no satisfaction from the proceeds of the sale of the tug for such advances as were made and merchandise furnished subsequent to October 28, 1893. It may be said that the fault lies with the insufficiency of proceeds to meet all the demands according to their various order and equities, and not with the inherent

justness of the principles applied by the court in making this final distribution, which will be as follows: As the court is advised that there is still pending before the commissioner for his report a claim for seaman's wages, amounting to $240, this sum should be set apart, with such costs as are likely to accrue, awaiting the adjudication of that claim. The sums of $196.70 and $35.20 will be paid to the Pacific Marine Supply Company and William J. Brady, respectively, for supplies, materials, and labor done to the tug. The sum of $935.62, the balance due on its mortgage on the tug, will be paid to the Pacific Marine Supply Company. The residue, after paying the costs of suit, will then be paid to William J. Brady, in partial satisfaction of his second mortgage. He will also get the benefit of such part of the amount reserved to abide the result of the claim for seaman's wages as the court may decide the latter not entitled to. Let decree for these several amounts be entered and an order of distribution made.