## WATTS *v.* J. B. CAMORS & Co.[*]

### (*Circuit Court, E. D. Louisiana.* June, 1881.)

1. CHARTER-PARTY—REPRESENTATIONS IN.

The representation of the registered measurement of a vessel in a charter-party is to be taken as merely descriptive, when the evidence shows that it was known to neither of the parties at the time the contract was entered into, and neither party was entrapped or mislead thereby, and when the contract, taken as a whole, shows that the real consideration actuating the charterers was the actual carrying capacity of the vessel.

2. SAME—CONSTRUCTION OF.

The court will not, at the instance of a party, construe a contract so that it would be necessarily void at the option of said party, if it does not appear that both parties intended it should be so construed.

3. SAME—MEASURE OF DAMAGES FOR THE VIOLATION OF.

The amount of damages to be awarded for the violation of a charter-party must be estimated by the rules of the commercial and admiralty law, and be the actual damages suffered, and not the amount of the stipulated penalty, although that might be the measure of damages under the law of the place where the charter-party was made.

In Admiralty.

*J. R. Beckwith*, for libellant.

*Henry C. Miller* and *J. Ward Gurley, Jr.*, for defendants.

*Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

PARDEE, C. J. This cause, tried and submitted at the last term, grows out of a charter-party entered into between the parties at the city of New Orleans on the eleventh day of August, 1879. The charter-party is in nearly the usual form, and only three quotations from it are necessary to present the case as it stands before the court:

(1.) "This charter-party, etc., between A. B. French & Co., agents for the owners of steam-ship Highbury, of the burden of 1,100 tons, or thereabouts, register measurements, due here between the tenth and twentieth of September, of the first part," etc. (2.) "The said party of the second part doth engage to provide and furnish to the said vessel a full and complete cargo, say about 11,500 quarters of wheat in bulk, and pay," etc. (3.) "To the true and faithful performance of all and every of the foregoing agreements, we, the said parties, do hereby bind ourselves, our heirs, executors, administrators, and assigns, and also the said vessel's freight, tackle, and appurtenances, and the merchandise to be laden on board, each to the other in the penal sum of estimated amount of freight."

The evidence taken in the case shows that the Highbury arrived on time, say September 9th, and on the 11th of September reported to the defendants as ready to comply with the terms of the charter-party. The defendants replied by letter on the 12th of September as follows:

NEW ORLEANS, September 12, 1879.

*Jacob Garson, Master S. S. Highbury*—DEAR SIR: We have received your notification stating that the S. S. Highbury, under your command, is ready for cargo, and have transmitted said notification to Messrs. Gordon & Gomilla, to whom we had sold the charter of said vessel. These gentlemen return for answer that they decline to accept said vessel under said charter, on the ground that the actual tonnage is greater than expressed in the charter. They further call upon us to deliver a steamer of the size mentioned, and we also call upon you to do the same.     Yours, truly,

[Signed]                              J. B. CAMORS & Co.

· On the twentieth of September defendants wrote to the master of the Highbury declaring themselves released from the obligations of the charter-party, and calling for a similar steamer. The Highbury waited the necessary time, and September 30th the master of the Highbury made public protest, which was served on the defendants, and thereafter the Highbury took on a cargo of cotton and oil cake, and sailed for Liverpool. The actual tonnage of the Highbury was 1,203 tons, and the ship could carry about 11,500 quarters of wheat. A ship of 1,100 tons cannot carry over 9,500 to 10,000 quarters of wheat. It appears that in dealing with cargoes of wheat in bulk usage allows a margin of 10 per cent. either way, but no more. The libellants demand judgment for the full amount of the estimated

freight, the penalty for default stipulated in the charter-party. The defendants claim that the representation in the charter-party of the register measurement of the Highbury was a substantive part of the contract, amounting to a warranty, and as the Highbury's actual tonnage largely exceeded the representation by over 100 tons, the defendants had a right to reject the ship and disregard the charter. And the defendants further claim that as they rejected the ship at once, it was the duty of the master and owners to at once have taken in other cargo, lessening any damages that might follow from the avoidance of the charter-party; and that, in fact, thereafter the ship did receive a more valuable freight, and therefore was not damaged at all by the conduct of the defendants.

The first question to decide is as to the effect of the misdescription of the register measurement of the Highbury. There is much evidence bearing on the customs and usages prevailing among shippers of wheat as to the size of cargoes, and what will avoid contracts for grain in bulk. And in this case there is evidence tending to show that charterers had no wheat to ship, and that freights were lower in September, 1879, than in August, and also tending to show that defendants were informed before the charter-party was made of the actual carrying capacity of the Highbury; but all of this is immaterial in the view I take of the contract. The contract, taken as a whole, can be made effective only by considering the representation of the register measurement as descriptive merely; in fact, the evidence shows that it was known to neither of the parties at the time the charter-party was entered into. The real consideration of the contract was, in the course of things, the carrying capacity of the ship, and this is shown by the agreement on the part of defendants to furnish a cargo of, say, about 11,500 quarters of wheat. As the defendants ask the court to construe the agreement, it would be necessarily void at the option of the defendants. If a ship of 1,100 tons carrying capacity had been tendered they could reject it, as it would not carry about 11,500 quarters of wheat, the stipulated amount of cargo. If a ship were tendered able to carry a cargo of 11,500 quarters, then they might reject it, as they have in this case, because the tonnage was over 1,100 tons, register measurements. In other words, the charter-party was binding on the owners, but the charterers might use their pleasure. The court can not give any such construction, as the terms of the charter-party do not warrant it.

The description in the charter-party of the register measurements of the Highbury was a mere representation, and not a warranty; and

as it was not fraudulent, and did not entrap or mislead the defendants, will not vitiate the contract, although the actual measurements exceeded the representation by some 100 tons. See *Ashburner* v. *Balchen*, 3 Selden, 262; *Barker* v. *Windle*, 6 Ellis & Black, 675; *Thomas* v. *Clarke*, 2 Starkie, 450.

The authorities cited by defendants' proctor all cover cases where the misrepresentations affected the time of receiving or delivering the cargo, or of the sailing or arrival of the vessel, which may well enter into the object and consideration of the contract. To my mind it is clear that the defendants were in default for not complying with their contract, and are liable for the damages resulting. What is the rule of damages is to me a very serious question.

The libellants claim that, as the contract was entered into in Louisiana, the law of Louisiana forms part of the contract, and under that law (Civil Code, arts. 2117–2129) the full amount of the stipulated penalty, the estimated amount of freight, is claimed. The defendants claim that the charter-party is an admiralty contract, to be enforced and construed by the settled principles of admiralty law; wherever the contract is made, that it is usually made on land, must be made somewhere, but wherever made, does not change or affect the principles of admiralty law which a court of admiralty enforces. And they claim, under the admiralty and commercial law, that the stipulated penalty in this case in the charter-party should not be treated as liquidated damages, but as a mere covenant to pay actual damages.

The learned proctors on each side have made strong arguments, well supported by authorities,—that for the libellant being particularly logical and forcible, and almost compelling conviction, but for the harsh results following its application. And it might be here noticed that under the Louisiana law, as claimed, it is only where there is a total breach that the total amount of the penalty can be exacted. See Rev. Civil Code, art. 2127.

The rule of damages as claimed by the defendants is the more equitable. It is the rule that prevails in the commercial world, and is the one recognized in all the text-books. See 1 Parsons, Adm. Law. 247, 248; Story, Cont. § 1022; Sedgw. Dam. 436, § 301; Conkling, Adm. *verbo* "Affreightments;" Abbott, Ship. 285.

The harsh rule claimed by libellant may be, and I am inclined to think is, the law of Louisiana, (Rev. Civil Code, arts. 2117 *et seq.*,) and in her courts, or on the law side of this circuit court, I might, in proper cases, enforce it; but sitting in admiralty, enforcing admi-

ralty law, I feel bound to lean to the equitable rule as against the harsh one claimed. And I am inclined to the opinion that it is the duty of the United States courts, in exercising admiralty and maritime jurisdiction, under the constitution to follow the general principles of the admiralty and maritime law, as they are recognized and prevail in the commercial world, rather than a narrow local law which may happen to prevail where a charter-party happens to be made, and which law was evidently not in the minds of the contracting parties. And there is authority for this position. See *U. S.* v. *Bank*, 1 Pet. 104; *The Bark Chusan*, 2 Story, 456.

The reasoning in *Neves* v. *Scott*, 13 How. 268, would seem to apply to the admiralty and maritime law, as well as to the equity jurisdiction and law controlling the courts of the United States.

On the whole, I am disposed to hold in this case that the penalty stipulated in the charter-party cannot be considered as liquidated damages between the parties, but that the libellants can recover only the actual damages suffered by the default of the charterers. These actual damages are for (1) the expenses incurred in fitting the Highbury to receive a cargo of grain; (2) the delay, after the expiration of the lay days stipulated in the charter-party, in obtaining and loading another cargo, to be allowed at the rate fixed in the contract; (3) the loss, if any, of freight on the cargo obtained, as against that contracted to be furnished by the defendants.

The defendants claim that it was the duty of the master and agents of the Highbury to have immediately sought another cargo on the first refusal of the defendants to accept the ship, and not have waited until the lay days had expired. Perhaps in some cases this might be so, but in this case I doubt if the master of the Highbury had a right to consider the first letter as a final refusal. The evidence of French, agent, is that he applied to Camors, defendant, for leave to load other cargo, and that Camors refused, and there was talk of arrangement and compromise, and even as late as September 29th letters in relation thereto passed between the parties; and each side during the lay days was threatening the other with claims for violation of the contract. So, I think, the master and agent of the Highbury had a right, and it was their duty, to wait such time as was necessary to put the defendants clearly in default.

A reference is necessary to ascertain the damages recoverable by the libellants before a final decree can be entered.