LEBLOND et al. v. McNEAR.

(District Court, N. D. California. September 28, 1900.)

No. 11,317.

1. SHIPPING—CONSTRUCTION OF CHARTER—DELAY FOR REPAIRS.

A vessel was chartered for a voyage from San Francisco to a European port with a cargo of wheat, and was to proceed in ballast from Australia, where she then was, to the port of loading. The charter provided that she should be in good condition, and a certificate of charterers' competent surveyor was to be furnished the charterers, which, if not satisfactory to either party, should be followed by a special survey or arbitration. Following such provisions was one that, "should the vessel fail to pass satisfactory survey,· or, in case of submission to arbitration, should the decision be against the vessel, or should the vessel be detained more than ten days for repairs, this charter to be void, at charterers' option." *Held*, that in view of the conditions existing at the time the charter was made, and the long voyage without profit which the vessel was required to make in order to enter upon the charter, the latter clause of such provision must be construed to relate to a delay for repairs occurring after the vessel had been tendered to the charterers, and found to be necessary by the surveyor or arbitrators, and that a delay of more than 10 days for repairs after the vessel reached San Francisco, but before she was tendered to the charterers, did not justify them in rescinding the charter.

2. SAME—RIGHT TO RESCIND CHARTER—DELAY IN DELIVERY OF VESSEL.

A total delay of 21 days after the vessel reached San Francisco, before she was tendered to the charterer, was not so unreasonable as to author· ize him to rescind the charter, where she was tendered nearly a month before the expiration of the time allowed by the charter for her arrival.

3. SAME—BREACH OF CHARTER—MEASURE OF DAMAGES.

The measure of damages for a total breach of a charter by the charterer, by refusing to accept the vessel, is the difference between the net earnings which the vessel would have made under the charter and the net earnings which she actually made, or should have made, during the time which would have been required, under ordinary conditions, to make the voyage required by the charter.

4 SAME.

Where, on the refusal of a charterer to accept the vessel, she was at once advertised for charter, and rechartered to the same person, for the same voyage, at a lower rate, which voyage she made, the difference between the freights to be paid under the two charters, plus the demurrage fixed by the original charter for the delay in obtaining the second, does not furnish the measure of damages, but the measure is the difference between the freight which would have been received under the first charter and the amount actually earned under the second, up to the time when the voyage under the first would have been completed, the expenses of the two voyages being presumably the same; and, where the one actually made was under ordinary conditions, it furnishes relevant evidence of the time which would have been required under the first charter.

In Admiralty. Action for breach of charter.

Andros & Frank, for libelants.

H. W. Hutton, for respondent.

DE HAVEN, District Judge. This is an action in personam to recover damages for the alleged breach of a contract, entered into between the libelants and defendant at Liverpool, England, on September 22, 1896, by which the libelants chartered the French bark Pierre Corneille to the defendant. The charter party recites that at its

date said vessel was "at or left Newcastle, N. S. W., to proceed in ballast to San Francisco, with about 50 tons coal for ship's account," and also contains the following provisions:

"The said vessel, being tight, staunch, strong, and in every way fitted and provided for said voyage, shall, after discharge of inward cargo or ballast, be made ready, and shall receive on board at San Francisco * * * a full and complete cargo of wheat, * * * and, being so loaded, shall therewith proceed to Queenstown or Falmouth for orders to discharge at a safe port in the United Kingdom or on the Continent, between Bordeaux or Hamburg. * * * Loading days not to commence before the 15th October, 1896, except at charterers' option. Should the vessel fail to arrive at San Francisco on or before the 31st December, 1896, charterers to have the option of canceling or maintaining the charter on arrival of vessel. * * * Vessel to be properly stowed and dunnaged, and certificate thereof, and of good general condition, draft of water, and ventilation, to be furnished to charterers from charterers' competent surveyor. If the captain or charterers be dissatisfied with the certificate given, the matter in dispute shall at once be submitted to two other regular port marine surveyors, one chosen by the captain, and one by the charterer, who, if they cannot agree, may call upon a third surveyor. A majority decision and certificate shall determine the matter in dispute, and the cost of said special survey shall be borne by the party against.whom said decision may be rendered. Should the vessel fail to pass satisfactory survey, or, in case of submission to arbitration, should the decision be against the vessel, or should she be detained more than ten days for repairs, the charter to be void, at charterers' option, such option to be declared at the expiry of said ten days. Upon discharge of inward cargo and/or ballast being so advanced as to make stiffening necessary to complete discharge of inward cargo and/or ballast, charterers to furnish the vessel with sufficient cargo for stiffening at discharge wharf as customary, the captain to give them usual written notice, accompanied by surveyor's certificate, stating that the vessel is ready to take in same and of the quantity required."

The Pierre Corneille arrived at San Francisco on the 11th day of November, 1896, in a damaged condition, the result of having been in collision with the British ship Larnaca. The damage received by her in this collision was not very great. Her hull was not injured, her bowsprit only having been broken, the gear connected therewith damaged, and her figurehead destroyed. In consequence of these injuries, it became necessary to repair the vessel. Proposals for making these repairs were solicited on November 19, 1896, the contract therefor let on the 24th of the same month, and on the same day the work of repairing was commenced, and finished on the afternoon of November 30, 1896. The vessel was sufficiently discharged of ballast on November 19, 1896, to permit the taking in of stiffening. On December 2, 1896, her master gave notice to the defendant that the vessel would be ready to receive stiffening at 7 o'clock on the morning of the next day. To this notice the defendant, on the same day, December 2d, replied as follows:

"Captain Leloquet—Dear Sir: Referring to charter party dated Liverpool, Sept. 22nd, 1896, your vessel arrived at San Francisco in a damaged condition on November 11th, and you have used 22 days in repairing damages, which is largely in excess of the time allowed you under the charter. I therefore elect to cancel said charter, and herewith give you notice to that effect. I return your stiffening notice.

"Yours, very truly,                                    G. W. McNear.
"Inclosure: Stiffening notice."

In giving the notice to which the foregoing letter was a reply, the master of the Pierre Corneille did not accompany the same with the

certificate of surveyor, as required by the charter party, and so two days thereafter, on December 4, 1896, he gave to the defendant a second notice, and inclosed therewith a surveyor's certificate to the effect that his vessel was in good condition, and lined sufficiently to take in all the stiffening then required. The defendant having refused to load the Pierre Corneille under the charter party, the vessel was offered for recharter, and, the defendant making the highest freight offer, she was rechartered to him, on the 18th of December, 1896, for the same voyage. The rate of freight agreed on, however, was 8s. 9d. less per ton of 2,240 pounds than that stipulated for in the previous charter party, of September 22, 1896.

1. I agree with the proctor for defendant that the Pierre Corneille was detained for repairs from November 19, 1896, the day when bids for making repairs were first called for, until the date of the actual completion of such repairs, on the 30th of the same month. Certainly all of that time was consumed in letting the contract for and making the repairs needed to put her in proper condition to perform the voyage for which she had been chartered, and the tender of the vessel to the defendant, for the purpose of receiving cargo under the charter, may be said to have been delayed during all of the time between those dates, on account of the necessity for making such repairs. Was the defendant, in view of this delay, justified in rescinding the contract of charter? The answer to this question must depend upon the construction of that clause of the charter party which gave to the defendant the option of rescinding in case the vessel should "be detained more than 10 days for repairs." The meaning of this clause will be better understood if read in connection with its context, as follows:

"Vessel to be properly stowed and dunnaged, and certificate thereof, and of good general condition, draft of water, and ventilation, to be furnished to charterers from charterers' competent surveyor. If the captain or charterers be dissatisfied with the certificate given, the matter in dispute shall at once be submitted to two other regular port marine surveyors, one chosen by the captain and one by the charterers, who, if they cannot agree, may call upon a third surveyor. A majority decision and certificate shall determine the matter in dispute, and the cost of said special survey shall be borne by the party against whom said decision may be rendered. Should the vessel fail to pass satisfactory survey, or, in case of submission to arbitration, should the decision be against the vessel, or should the vessel be detained more than ten days for repairs, this charter to be void, at charterers' option, such option to be declared at the expiry of said ten days."

What did the parties intend by the words, "detained more than ten days for repairs"? What was their understanding as to the time when the period of 10 days allowed by the contract for repairs should commence? The defendant insists that the commencement of this period was the date when the ship, but for her needed repairs, would have been ready to take on that portion of her outward cargo designated as "stiffening." The contention of the libelants, on the other hand, is that it was not the intention of the parties that the 10 days mentioned in this clause of the charter should begin to run until after the vessel had been tendered to the charterers, and her general condition ascertained by the survey or arbitration provided for in the charter party. This latter construction is, in my opinion, the true

one. The terms of the agreement, as stated in the contract of charter, were that the vessel was to be staunch, strong, and in every way fitted for the voyage; to be properly stowed and dunnaged by her owners; and certificate showing all of these facts, and vessel's draught of water and ventilation, were "to be furnished to charterers from charterers' competent surveyor." It is evident that all of these matters were not intended to be embraced in one certificate. The certificate of proper stowage and dunnage, draught of water, and ventilation of the vessel could not be given until after the loading of the cargo had been completed; but it is manifest that a certificate in relation to the general condition of the vessel, and her fitness to perform the intended voyage, was to be furnished to the charterer before he could be required to load her with the cargo called for by the charter. The contract contemplated that the charterer should first have notice that the vessel was ready to receive her cargo. Giving this notice would be, in effect, a tender of the vessel under the charter, and this tender was to be followed by the survey and certificate of charterer's competent surveyor concerning the vessel's condition. If this survey was satisfactory to the parties, then the vessel was to receive her cargo. It was, however, specified that the decision of the surveyor appointed by the charterer was not to be final if either party was dissatisfied therewith, and in that event it was stipulated that there should be a special survey or arbitration for the purpose of settling the matters in dispute, and in this immediate connection we find the provision: "Should the vessel fail to pass satisfactory survey, or, in case of submission to arbitration, should the decision be against the vessel, or should the vessel be detained more than ten days for repairs, this charter to be void, at charterers' option." This clause in relation to detention for repairs refers to such repairs as might, by the special survey or arbitration, be found necessary to put the vessel in the general good condition required by the charter, and not to repairs which might be made before the vessel was tendered to the charterer. The opposite construction, contended for by the defendant, would certainly result in giving him an undue advantage, and cannot be accepted as expressive of the intention of the parties. The vessel was chartered to proceed in ballast from Australia to the port of San Francisco for the purpose of taking on a cargo on which freight could be earned. This was known to be a long and expensive voyage, and that the whole commercial value of the enterprise, so far as the vessel was concerned, would be entirely dependent upon the fulfillment of the terms of the charter party. It is difficult to believe that under such circumstances the libelants would have been willing to accept, as one of the terms of the charter, a provision to the effect that if their vessel, during the course of the voyage between Australia and San Francisco, should receive damage that would require more than 10 days to repair after the discharge of her ballast, the charterer should have the option of canceling the contract, thus rendering fruitless the long and expensive voyage undertaken, unless the vessel should be so fortunate as to secure another cargo. The parties could, of course, make such an agreement if they so desired; but, to justify the court in so inter-

preting their contract, the language employed by them should be so clear and explicit as to admit of no other reasonable construction. My conclusion on this point, as already indicated, is that the libelants had the right, after the arrival of the vessel in the port of San Fran-cisco and before her tender to the defendant, to make such repairs as in their judgment were necessary to put her in the condition called for by the charter, and the fact that the time occupied in making such repairs was more than 10 days did not justify the defendant in rescinding the contract under that clause of the charter relating to detention on account of repairs.

2. It is also claimed by the defendant that, independently of the option given him to rescind the contract if the vessel was detained more than 10 days for repairs, he was justified in refusing to load the vessel because she was not tendered to him within a reasonable time after her arrival in the port of San Francisco; that the whole value of the charter to him depended upon the vessel having quick dispatch from San Francisco; and the delay in offering her to him, from the 11th day of November, 1896, the day of her arrival in the port of San Francisco, until the 2d of December following, rendered the vessel of "no value to him whatever for the purposes for which he had originally chartered her." There is no evidence to sustain this defense, nor could any have been offered, in view of the fact that the ship was tendered to the defendant on the 2d of December, 1896, 29 days before the expiration of the time allowed by the charter for her arrival in San Francisco.

3. The only question that remains for consideration is that which relates to the damages libelants are entitled to recover. The defendant was allowed, by the terms of the contract sued on, 20 working lay days, commencing 24 hours after final discharge of inward ballast, within which to load the vessel; and it was further stipulated that, for each and every day's detention by default of defendant, he would pay to the libelants 4d. sterling, or its equivalent, per register ton of the vessel. It is alleged in the libel, and not denied by defendant in his answer, that after his refusal to load the Pierre Corneille under the contract sued on, "and as soon as with reasonable diligence the vessel could be rechartered," the libelants "rechartered her for the same voyage, at the highest rate then obtainable." The defendant repudiated his contract on December 2, 1896, and the vessel was not rechartered until the 18th of the same month. The libelants seek in this action to recover, as damages, the difference between the charter rate for freight under the charter party of September 22, 1896, and that fixed by the charter party made on December 18, 1896, and also for 15 days' detention of the vessel at San Francisco, from December 2, 1896, to December 18, 1896, at the rate stipulated in the contract sued on for each day's detention.

The measure of damages in this class of actions seems to be well settled. In an action against the charterer of a ship for a total breach of his contract, the measure of damages is the net amount that would have been earned by the vessel under the charter sued on, less the net amount earned, or which might with reasonable diligence have been earned, by the vessel during the time required for

the performance of the voyage named in such contract of charter. Smith v. McGuire, 3 Hurl. & N. 554; Utter v. Chapman, 38 Cal. 659; Id., 43 Cal. 279; Ashburner v. Balchen, 7 N. Y. 262; Dean v. Ritter, 18 Mo. 182; Steamship Co. v. Card (D. C.) 59 Fed. 159; 3 Suth. Dam. pp. 179–181.

The case of Smith v. McGuire, above cited, is a leading case upon the question now under consideration. That was an action for breach of a contract of charter whereby the plaintiff's vessel had been chartered by the defendant to carry a full cargo of oats from Limerick to London. The contract provided that 12 days should be allowed for loading, and, if the vessel was longer delayed, the charterer was to pay three guineas per day demurrage. The defendant refused to load the vessel, and she was detained at Limerick 39 days after the expiration of her lay days, when she obtained another charter for the same voyage, but at a reduced rate of freight. The plaintiff in his particulars of demand for damages claimed that he was entitled to recover £122. 17s. demurrage at the rate named in the charter for the detention of his ship, and also the difference between the freight earned under the second charter and that which would have been receivable under the first. In his charge Baron Martin informed the jury "that the claim in the particulars was not a proper estimate of the damage; that the legal damage was the loss which had arisen from the breach of the contract; that from the amount of freight which the ship would have earned if the charter party had been performed there ought to be deducted the expenses which would have been incurred in earning it, and also any profit which the ship earned between the expiration of the lay days and the time when the employment of the ship under the charter party would have ended." The jury returned a verdict for the plaintiff allowing him the following items of damage: £122. 17s. demurrage for 39 days; and £68. 8s., the difference between the freight earned under the second charter and that which would have been earned under the first. The court of exchequer, all the judges concurring, held that the charge to the jury was correct, but granted a new trial upon the ground that the damages were not properly assessed by the jury. In his opinion, upon the rule for a new trial in that case, Baron Martin said:

"With respect to the damages, I entertain the same opinion that I expressed at the trial. The proper mode of assessing them would be to take the damage actually proved. The plaintiff was compelled to give particulars of damage, and, as frequently happens in such cases, he gave particulars of the damage which he had actually sustained, but which, when investigated, turned out not to be the legal damage arising from the breach of contract. In my judgment, neither the £68. 8s. 9d. or £122. 17s. are correct items of damage. The real damage is the loss arising from the breach of contract. That is to be ascertained by calculation of the freight to be earned, and deduction of the expenses which the shipowner would be put to in earning it, and what the ship earned (if anything) during the period which would have been occupied in performing the voyage ought also to be deducted."

The case of Ashburner v. Balchen, 7 N. Y. 262, was also an action by the owner of a schooner to recover damages for the charterer's refusal to load the vessel. The vessel had been chartered by the

defendant for a voyage from New York to a convenient port in Ireland. Upon the trial a statement of the earnings and expenses of the plaintiff's schooner during the period which the voyage from New York to Ireland would have required was given in evidence, and the court instructed the jury that "the defendant should be charged with the full amount of freight which he agreed to pay under the charter, and * * * credited with the amount of the schooner's earnings during the time that an average passage to Ireland, with the lay days, would have occupied." This charge was held correct by the court of appeals.

In the case at bar, the voyage for which the Pierre Corneille was employed being the same under both charters, it is obvious that the expense of earning the freight stipulated for would be the same under one charter as the other, and, if there had been no delay in obtaining the second charter, the libelants would, under the rule above stated, be entitled to recover as damages the difference between the gross freight which would have been earned under the charter of September 22, 1896, and that earned under the later contract of December 18, 1896. But, by reason of the detention of the vessel from the 2d until the 18th of December, the freight earned under the second charter was presumptively not all earned within the time the voyage would have been performed under the charter sued on. This being so, the defendant, after being charged with the full amount of freight he agreed to pay by the terms of such charter, is only entitled to be credited with so much of the freight received under the subsequent charter as was actually earned by the vessel during the period of time covered by the charter sued on. The difference between these two amounts the libelants are entitled to recover as damages. In order to ascertain the date when the employment of the Pierre Corneille under the first charter would have ended, there must be added to the lay days allowed by that charter, commencing on December 3, 1896, the number of days she was thereafter engaged in discharging inward ballast, and the average time required for a vessel of her speed to make the voyage for which she was chartered, as was done in the case of Ashburner v. Balchen, 7 N. Y. 262. The time actually consumed in making the voyage under the second charter, if the voyage was performed under ordinary conditions and circumstances, would be relevant, and perhaps the most satisfactory evidence tending to show the time required for her to make such a voyage at that season of the year. The period of time covered by the first charter ascertained, it ought not to be difficult to show how many days, if any, the vessel was thereafter employed in earning the freight received by her under the second charter, and the proportionate amount thereof with which the defendant should be credited. Libelants are entitled to a decree for the damages sustained by them, with interest and costs, interest to be calculated from the date of the filing of the libel. The case will be referred to United States Commissioner Morse, to ascertain and report the amount of damages.