THEBIDEAU et al. v. CAIRNS et al. (D. W. CLARK ICE CO., Garnishee).

(District Court, D. Maine. July 8, 1909.)

No. 57.

1. SHIPPING (§ 43*)—CHARTER—READINESS AND DISPATCH.

Where a charter of a vessel contains no stipulation as to the day on which she shall load, she is required only to sail for the port of loading within a reasonable time and proceed with reasonable dispatch, and unavoidable delays due to perils of the seas do not release the charterer from his contract.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 165-168; Dec. Dig. § 43.*]

2. SHIPPING (§ 52*)—CHARTER—BREACH BY CHARTERER.

Where a schooner chartered to carry a cargo of ice from Boothbay, Me., was then in the harbor at Salem, Mass., where she was detained some days by ice, but left as soon as practicable and reported for loading two days thereafter, the refusal of the charterer to load her on account of the delay was not justified and was a breach of the contract.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 211; Dec. Dig. § 52.*]

3. SHIPPING (§ 58*)—CHARTER—ACTION FOR BREACH—DAMAGES.

Where a charterer refused, without legal excuse, to load a schooner with a cargo of ice, and after some delay she obtained a part of a cargo for the same voyage at an advanced freight, the measure of her damages recoverable for breach of the first charter was the difference between what she would have earned thereunder and what she did earn under the second, plus damages for the additional time required to complete the second voyage after she would have completed the first; her expenses being practically the same while in port as on a voyage.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 58.*]

4. GARNISHMENT (§ 130*)—LIABILITY OF GARNISHEE—SET-OFF.

A garnishee, which at the time of the service of process upon it had in its hands a sum of money belonging to respondents, but also had a contract with them to protect it against a claim of a third party which it paid, held entitled to set off such amount against the sum in its hands and to be discharged on paying the remainder to the libelant.

[Ed. Note.—For other cases, see Garnishment, Cent. Dig. § 255; Dec. Dig. § 130.*]

In Admiralty. Suit for breach of charter.

Benj. Thompson, for libelant and garnishee.

James R. Parsons, for respondents.

HALE, District Judge. Thomas M. Thebideau, master and agent of the three-masted schooner W. R. Huston, brings this libel in personam, in behalf of the owners of the schooner, against the respondents, Cairns and Moore, residents of New York, to recover damages alleged to have been sustained by the libelants in consequence of the respondents' refusal to load said schooner at Boothbay Harbor in February, 1907. The D. W. Clark Ice Company is summoned as garnishee.

1.What was the contract? And what were the relations between the three parties, the libelants, respondents, and garnishee, at the time the contract was made?

The libel alleges that on January 26, 1907, the libelant, as master and agent of the schooner W. R. Huston, entered into an oral charter of that schooner to the respondents, by which the respondents agreed to load ice at Boothbay for New York at the freight of 90 cents, 12 days to load and discharge. The respondents' answer admits the above allegation with reference to the charter party. While the pleadings are decisive as to what the contract was, it is necessary to briefly consider the testimony before the court, in order to find the precise relation between the three parties to the controversy.

The testimony shows that on the 26th day of January, 1907, the respondents, Cairns and Moore, made an agreement in writing with the D. W. Clark Ice Company of the following tenor:

"We will accept your offer for one cargo of ice at $.60 per ton, net, f. o. b. bill of lading weight, sight draft with bill of lading, or cash upon receiving the same properly signed. We also hereby authorize you to charter vessels on our account to load ice, you to secure as low a rate as possible."

On the same day D. W. Clark Ice Company chartered for the respondents, through J. S. Winslow & Co., Portland, "the schooner W. R. Huston, to load ice at Boothbay to New York, freight $.90, twelve days to load and discharge"; and the master was ordered to report to Luther Maddocks, Boothbay Harbor, Me. On January 31, 1907, Cairns and Moore directed D. W. Clark Ice Company to:

"Consign schooner W. R. Huston to Cairns and Moore at Hewes street, Wallabout creek, Brooklyn, New York, free wharfage and sufficient water at dock guaranteed, freight $.90, 12 days to load and discharge. Ask captain to report to Grill Ice Company, office foot of Hewes street, or phone 530 East New York."

At the time of making the contract between the ice company and the respondents, as well as at the time of the charter of the schooner, the ice company had made a verbal contract with the said Maddocks for the purchase of water ice. In consequence of this contract with Maddocks, two cargoes of ice had been shipped. As soon as the ice company had made its contract with the respondents, it notified Maddocks that the Huston had been chartered, and requested him to load her on arrival.

2. Has there been a breach of the charter?

The libel alleges that, as soon after the making of the charter as the weather would permit, the schooner proceeded to Boothbay and reported to Luther Maddocks, who was to load her, and that thereafter she was at all times ready to receive cargo. The respondents in their answer admit that the schooner was properly equipped for the voyage, and that the respondents refused to load her. They allege: That, although the libelants had entered into a maritime contract in the nature of a charter party, their schooner did not proceed to the place of loading within such time as the weather conditions allowed; that her arrival at Boothbay Harbor was long after the time agreed for her to be there, ready to load; that in consequence of such delay the respondents refused to load her on her arrival; and that whatever damage the libelants have suffered was by reason of their own acts in unreasonably delaying the performance of the contract.

On this question of the readiness of the schooner to receive her

load within the proper time, the testimony is not extended nor contradictory. On Friday, January 25, 1907, Capt. Thebideau learned of the proposed charter of the Huston; that vessel then being at the wharf in Salem Harbor, with her sails bent. On the following Monday he received an order through Samuel R. Crowell, his broker, in Boston, directing him to report to Maddocks at Boothbay Harbor, for a cargo of ice. On the same day he went to Salem to get his vessel in readiness. Before doing so he arranged for the stores to be sent on board. He opened shipping articles for a crew, and made arrangements for them to be sent at a moment's notice. It appears that about two hours' time are required to get a crew from Boston to Salem. At the time in question, Salem Harbor was frozen over, and the weather was such that the Huston did not sail from that port until about 7 o'clock in the morning of February 11th. Capt. Thebideau testifies: That he began his voyage at the earliest possible moment; that no other vessel in Salem Harbor, bound east, had sailed earlier than the Huston; that at one time she started out and proceeded as far east as Cape Ann, when the wind breezed up and hauled ahead, so that she was compelled to return to Salem for a harbor; that one of the heaviest gales of the winter occurred that night; that on February 11th, the wind being west northwest, she got under way at 7 a. m. and proceeded on her voyage; that at 8 p. m. she anchored inside the Cuckolds just outside of Boothbay Harbor; that she anchored there because of a head wind and head tide, and because she could go no further; that on February 12th she did not get under way until 2:30, as it was blowing too hard for a light vessel to beat; that on that evening she came to anchor, and on the 13th, at about 1 o'clock p. m., was towed to the wharf; that the captain reported to Maddocks as directed, and at that time his vessel was ready to receive cargo. There is nothing to contradict the testimony of the master of the schooner. The libelants offer further testimony tending to show that the failure of the schooner to arrive was not the real reason of the respondents' attempt to cancel the charter party; but that such attempt was due to the fact that there had been a sudden decline of the price of ice in the market. They show: That on February 4th Cairns and Moore wired the agent of the ice company:

"Market very low. Ice on Huston would not pay freight. Do not load under any conditions."

That upon receipt of this telegram the ice company wired:

"Vessel is now under charter to load. Impossible to cancel order."

That on February 5th the respondents wired Mr. Clark of the ice company:

"Captain has not lived up to agreement. Will not accept cargo."

That on February 6th the ice company wrote the respondents, acknowledging receipt of their two telegrams of February 4th and 5th, and stating that they were greatly surprised at the contents of the telegrams, and further stating that they could not understand why the decline of the market should in any way affect the trade and charter of the schooner. On February 8th the respondents wrote Mr.

Clark of the ice company that the Huston was to have started loading ice a week from last Tuesday, and at that time they had a market for it; but at the present time they had not a market for it. The letter of the respondents to Mr. Clark concluded by saying:

"We positively refuse to accept the cargo and beg you to advise her brokers."

On February 9th the ice company wrote the respondents acknowledging the receipt of their favor, and saying that they note that:

"You positively refuse to accept the cargo of ice which we have sold you, and that you desire us to advise the vessel's brokers.. * * * We are, as you know, not only able to comply with our part of the contract in every particular, but are anxious to do so, and avoid the annoyance growing out of do-. ing business in this way."

This letter also states:

"We are notifying both the broker and master of the Huston of your position, and they will doubtless have a claim against you for damages which must be arranged in some way. This matter can probably be very much better adjusted now than it can after legal proceedings have been commenced by the vessel owners."

The whole testimony upon this point induces the belief that the delay caused by the schooner's failure to arrive at her loading port was due to head winds and heavy weather and in general to perils of the seas, and that therefore the charterers were not relieved from the obligations of the charter party. It is a well-settled rule of maritime law that all contracts under which vessels are to proceed on a voyage, for the receipt of cargo, are contingent upon the perils of navigation. Huron Barge Company v. Turney et al. (D. C.) 71 Fed. 972, 977; The Hiram (D. C.) 101 Fed. 138.

In Hall v. Hurlbut, Fed. Cas. No. 5936, a Circuit Court case in 1858, Mr. Chief Justice Taney of the Supreme Court said:

"The written contract contains no stipulation on their part that the vessel shall arrive at or before a particular day. The law implies no other condition than that reasonable and proper exertions shall be made, to perform the voyages contemplated by the charter party, as speedily as practicable; and the shipper takes the risk of delay or detention, by any superior force which the vessel could not resist or overcome, whether it be an embargo by the government, or a storm on the ocean."

In Fearing v. Cheeseman, 3 Cliff. 91, Fed. Cas. No. 4710, a Circuit Court case arising in this district, in speaking for the Circuit Court, Mr. Justice Clifford held:

"Where in a charter party no stipulation is made as to the day the vessel should sail, or the time she was to be allowed for the trip, the rule of construction is that she is to sail within a reasonable time, and to proceed with reasonable dispatch, and without unnecessary deviation, to the place of loading, unless delayed by the public enemy or perils of the seas."

The court said:

"Performance of that implied covenant was as much required by the charter party as that notice of readiness of the vessel to receive cargo should be given on her arrival at the place of loading. Such notice could not properly be given before the vessel actually arrived, and the implied requirement was that she should proceed there with reasonable dispatch, the dangers of the seas and navigation excepted. Unavoidable delay arising from these causes would not discharge the charterers from their covenant to load the vessel, un-

less the delay was so great as to frustrate the voyage or deprive the freighter of the benefit of his contract."

The evidence in the case at bar compels me to decide that there was no unnecessary delay on the part of the schooner; that reasonable and proper exertions were made to arrive at the port of shipment; that the libelants have not waived the provisions of the charter party; but that there has been a breach of the charter by the respondents.

3. What damages, then, are the libelants entitled to recover? The law on this subject is to be determined by the courts of admiralty, on well-defined principles.

Scrutton on Charter Parties, pp. 271, 272, states the English rule:

"In an action against charterer for not loading a cargo, the measure of damage is the amount of freight which would have been earned under the charter, after deducting the expenses of earning it, and also any net profit the ship may have earned during the period of the charter. It is probable that any freight the ship might have earned by reasonable diligence after the final breach is to be deducted also."

In Jordan v. Eaton, Fed. Cas. No. 7520, Judge Fox of this district defines the correct rule in this country:

"The damages, for breach of a charter by the shipper, is the difference between the price stipulated and the freight that could be obtained for the same voyage by reasonable diligence."

In Watts v. J. B. Camors & Co. (C. C.) 10 Fed. 145, Judge Pardee states the rule of damages in cases of delay and in cases of loss of earnings:

"The libelants can recover only the actual damages suffered by the default of the charterers. These actual damages are for: (1) The expenses incurred in fitting the Highbury to receive a cargo of grain; (2) the delay, after the expiration of the lay days stipulated in the charter party, in obtaining and loading another cargo, to be allowed at the rate fixed in the contract; (3) the loss, if any, of freight on the cargo obtained, as against that contracted to be furnished by the defendants."

This case was affirmed by the Supreme Court in 115 U. S. 353, 6 Sup. Ct. 91, 29 L. Ed. 406.

In Dalbeattie Steamship Co., Limited, v. Card (D. C.) 59 Fed. 159, it was held by Judge Simonton:

"In awarding damages against a charterer for refusing a vessel, the net freight earned by obtaining another—less valuable—cargo is to be deducted from the sum which would have been earned under the charter."

In Leblond v. McNear (D. C.) 104 Fed. 826, the District Court of California held:

"Where, on the refusal of a charterer to accept the vessel, she was at once advertised for charter, and rechartered to the same person, for the same voyage, at a lower rate, which voyage she made, the difference between the freights to be paid under the two charters, plus the demurrage fixed by the original charter for the delay in obtaining the second, does not furnish the measure of damages; but the measure is the difference between the freight which would have been received under the first charter and the amount actually earned under the second, up to the time when the voyage under the first would have been completed, the expenses of the two voyages being presumably the same; and, where the one actually made was under ordinary conditions, it furnishes relevant evidence of the time which would have been required under the first charter."

And the case was affirmed in McNear v. Leblond, 123 Fed. 384, 61 C. C. A. 564, where the Circuit Court of Appeals said:

"Where, on the refusal of a charterer, without legal cause, to accept the vessel, she was at once advertised for charter and rechartered to the same person, for the same voyage, at a lower rate, which voyage she made, the measure of damages for breach of the first charter is the difference between the freight she would have received under such charter and the amount actually earned under the second up to the time when the voyage under the first would have been completed, the expenses of the two voyages being presumably the same; and where the one actually made was under ordinary conditions, it furnishes relevant evidence of the time which would have been required under the first charter." Cornwall v. J. J. Moore & Co. (D. C.) 125 Fed. 646; Id., 132 Fed. 868; Id., 144 Fed. 22, 32, 75 C. C. A. 180.

In The Gazelle and Cargo, 128 U. S. 474, 487, 9 Sup. Ct. 139, 142, 32 L. Ed. 496, in speaking for the Supreme Court, Mr. Justice Gray said:

"The Circuit Court has found simply that the time required to perform such a voyage as that stated in the charter would have been about the same time as elapsed before the vessel procured another charter; that another charter was procured as soon as could have been done; and that the expenses of the vessel in port were not less than on the voyage.

"Nothing, therefore, is shown to take the case out of the general rule, that a shipowner, who is prevented from performing the voyage by a wrongful act of the charterer, is prima facie entitled to the freight that he would have earned, less what it would have cost him to earn it."

In the case at bar, the schooner, at the time of the refusal to load, was in a port away from the center of trade, and where opportunities for charter were limited, in a great measure, to the ice trade. The evidence relating to this point is found in the uncontradicted testimony of the master of the schooner. He says: That, when the respondents refused to load under the charter, he immediately sought to obtain other employment; that he did not succeed until March 3d, when he contracted by charter for about a half a cargo of ice, but at a freight of $1.25; that on March 5th the Huston began to load under the latter charter, and completed her loading the same day, having on board 536 tons of ice.

The court is requested by all parties to the controversy to itself award the damages, in order to save the expense of reference to an assessor. It is not altogether easy to make this award, upon the testimony before me. The substantial facts relating to the award of damages are these: On January 28th Capt. Thebideau began to prepare his schooner for the voyage. He arrived at Boothbay Harbor on February 13th, and would have been loaded on the 15th; but he did not succeed in getting a new charter until March 3d. On the new charter he began loading March 5th, and finished March 6th, having on board 536 tons. If the respondents had loaded the Huston immediately upon her reporting on February 13th, I may fairly assume that she might have been able to perform her voyage in 10 days, and would have reached New York by February 25th, and would have made delivery of her cargo 9 days later, or March 7th. This would have given the charterers the full 12 days for loading and discharging, and would have allowed 10 days to make the run to New York. Leblond v. McNear,

supra, was decided upon somewhat similar facts. In that case the court held:

"The measure is the difference between the freight which would have been received under the first charter and the amount actually earned under the second, up to the time when the voyage under the first would have been completed; the expenses of the two voyages being presumably the same."

The court must deal with the facts before it in a reasonable manner, with the view of obtaining substantial justice; and, in case of uncertainties and difficulties in determining the exact loss, the court should see that the loss falls, as far as possible, upon the respondents, when they are found to be at fault. There are many cases, where courts have dealt with this question upon records showing difficulties somewhat like those in the case at bar. Venus Shipping Co. v. Wilson, 152 Fed. 170, 81 C. C. A. 368; The Gazelle, 2 Rob. Adm. 279; Tabor v. Dexler, Fed. Cas. No. 13,723; Stepanovit v. Gillibrand, Fed. Cas. No. 13,360; Roehm v. Horst, 91 Fed. 345, 349, 33 C. C. A. 550; Taylor Manufacturing Co. v. Hatcher Manufacturing Co. (C. C.) 39 Fed. 440, 3 L. R. A. 587.

Upon careful examination of the evidence relating to damages, I think it fair to assume that the second charter would require substantially the same length of time to perform as the first charter required. It would take slightly less time to discharge the 536 tons of ice than it would have taken to discharge the full cargo of 950 tons. If the schooner had carried the same amount of cargo on the second voyage which she carried on the first voyage, the damages would have been simply the delay in obtaining the second cargo; but she carried less under the second charter than she would have carried under the first, and so we have the element of dead freight to be taken into consideration, making allowance, of course, for the increased rate of freight that the vessel received under the second charter of $1.25 for a small cargo, over the 90 cents which she was entitled to receive on the first cargo. We may accept 950 tons as the carrying capacity of the vessel. At a freight of 90 cents per ton on the 950 tons, we have $855. From this deduct freight on 536 tons at $1.25 per ton, $670, leaving $185. To this must be added damages for such further delay as the vessel sustained by detention over and above the time which was required to perform the voyage. It is difficult to find exactly what this time should be. I allow 10 days, at the rate of $55 per day, or $550. Adding this to the $185, we have $735, to which should be added interest from April 1, 1907, $115, making a total of $850.

4. For what amount should the garnishee, the D. W. Clark Ice Company, be charged? Its answer states that, at the time of the service of the process of this court, it had in its hands the sum of $100. It seeks to set off against this sum the damages which it has sustained by the respondents' failure to carry out their contract. In addition to this the garnishee seeks to set off such amount as it has been obliged to pay Luther Maddocks for damages sustained by him, in consequence of the failure of the garnishee to carry out its contract for the purchase of a cargo of ice; the garnishee claiming that its obligation to pay Maddocks arises from a contract made between it and the respondents. The testimony shows that at the time of making the origi-

·nal contract between the garnishee and the respondents, for the sale of the cargo of ice, Cairns and Moore, the respondents, paid the ice company $600. The ice company held the $600 until February 19th, when Mr. Clark met one of the representatives of Cairns and Moore at the Knickerbocker Hotel in New York. At this interview Mr. Luther Maddocks of Boothbay Harbor was also present, and then claimed damages for the failure to load the Huston. On the following morning Mr. Clark met Mr. Cairns at the same hotel, and, after some negotiations respecting an adjustment of the matter, the latter prepared and gave Mr. Clark a writing of the following tenor:

"We hereby agree to protect the D. W. Clark Ice Company of Portland, Maine, from any and all claims or damages for delays or refusals to load said schooner W. R. Huston chartered by us to load ice at Boothbay, Maine."

Later the Maddocks claim was adjusted by the ice company paying him the sum of $150. The ice company now claims that it should be permitted to offset that amount against the fund of $400 in its hands at the time of the service of the process.

The court must give some weight to this agreement, based as it was upon a valid consideration, and it appearing that the Maddocks claim must not only have been in the minds of the parties at the time of making this agreement, but clearly was the one intended to be covered by it. The claim of the garnishee is therefore sustained. The sum of $150 paid to Luther Maddocks may be set off against the funds in the garnishee's hands. In addition thereto, the ice company should be allowed the difference between the contract price for the purchase of the ice at 45 cents per ton, and the selling price, 60 cents per ton. The loss of profits on 950 tons at 15 cents per ton is $135; amount paid Luther Maddocks, $150—making a total of $285. This sum should be allowed to the ice company as a set-off against the money in its hands at the time of service of the process. This leaves a balance of $115 in the hands of the garnishee, and for this it should be charged. No interest should be charged the garnishee for the funds while in its hands, as no interest was received by the garnishee.

5. A decree may be entered for the libelants for the sum of $850, with costs.

The garnishee is to be charged for the sum of $115, less its costs.