WILHELMSENS DAMPSKIBAKTIESSELSKAB et al. v. CANADIAN VENEZUELAN ORE CO., Limited, et al.

AKTIESELSKABET C. MATHIESENS REDERI v. SUBCHARTER FREIGHT, ETC., et al.

(Circuit Court of Appeals, Second Circuit. March 9, 1915.)

Nos. 195, 196.

1. PRINCIPAL AND AGENT ⬤⟿132—AGENT'S CONTRACT—VALIDITY—OFFER AND ACCEPTANCE.

  After negotiations between the agent of a time charterer of certain steamships, who had general authority to make subcharters, and a proposed subcharterer, the latter prepared a written contract of subcharter for two years, which was sent by mail to such agent for signature. In his answer he referred to the contract and stated that before signing he desired explanation or modification of two clauses therein, and his suggestions in both respects were agreed to by a letter in response. In a subsequent letter it was stated that to save any question the subcharterer requested that the contract be signed by an officer of the corporation time charterer expressly authorized by its by-laws to execute such instruments. *Held* that, by the agreement between the subcharterer and the agent of the time charterer, who was in fact authorized to execute the contract, upon all the terms of such contract, the minds of the parties met, and a valid contract was made, binding on both; the incorporation of the contract by reference in the letter of the agent being a sufficient "memorandum in writing" signed by "the lawful agent of the party to be charged" to satisfy the statute of frauds, and that such contract was not

invalidated by the subsequent refusal of the president of the time char-
terer to sign it.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 459,
467–471; Dec. Dig. ☞132.]

2. ADMIRALTY ☞47—FOREIGN ATTACHMENT—DEFENSES BY GARNISHEE.
    A garnishee under a foreign attachment in admiralty may set off a
claim in his favor against the respondent, notwithstanding the fact that
it is one not cognizable in admiralty.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 396–403;
Dec. Dig. ☞47.]

    Ward, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the South-
ern District of New York.

These causes come here upon appeal from decrees of the District
Court, Southern District of New York, in favor of libelants.   The
questions presented are the same in each case and it will tend to simpli-
fy the matter if the facts in the first case only are discussed in this
opinion.   The libelant is hereinafter called the Wilhelmsens Company
or the shipowner; the respondent is called the Canadian Company;
the garnishee is called the Inter-American Company.

R. Leech, of New York City, for appellant.

Haight, Sandford & Smith, of New York City (John W. Griffen,
of New York City, of counsel), for appellees Wilhelmsens Damp-
skibaktiesselskab and others.

Convers & Kirlin, of New York City (J. M. Woolsey, of New York
City, of counsel), for appellee Aktieselskabet C. Mathiesens Rederi.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge.   Libelant, owner of the steamship Tra-
falgar, brought suit in admiralty against the Canadian Company for un-
paid charter hire.   No one disputes the finding of the District Court
that respondent owes libelant over $5,000 for such unpaid charter
hire.   Process in such suit was issued, with clause of foreign attach-
ment against respondent's credits, effects, etc., in the hands of the
Inter-American Company.   No one disputes the finding that there is
due by the latter company to the Canadian Company the sum of $1,-
823.25 for unpaid charter hire under a subcharter of the Trafalgar
by the Canadian Company to the Inter-American Company.   The lat-
ter company, however, set up a prior cause of action of itself against
the Canadian Company for breach of contract, alleging that the dam-
ages therefrom would greatly exceed the amounts which might be due
to the Canadian Company for charter hire of the Trafalgar and the
Imataca (the steamship with which the second suit is concerned).   It
therefore denied that there were any credits in its hands belonging to
the Canadian Company.   The District Court found that the damages
resulting from the breach of this alleged contract—if the making of the
contract were proved—will exceed all unpaid charter hire due from the
Inter-American to the Canadian Company on vessels subchartered by
the latter to the former.   No one disputes this finding.   The District
Court, however, found that no contract such as the garnishee set up
had been proved, and therefore entered decree that libelant recover

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

from the garnishee "the said sum of $1,823.25 belonging to the Canadian Company, which sum is in the hands of said garnishee." From that decree the garnishee appeals.

[1] The first question to be determined is whether such contract was made. Its general character is set forth correctly by the Commissioner (whose report was confirmed by the District Judge without opinion) as follows:

"The contract is alleged to be set forth in an unsigned writing * * * the substance of which was that the Canadian-Venezuelan Company should furnish the Inter-American Company with steamers for the carriage of all coal provided by the Inter-American Company for shipment from Philadelphia, Norfolk, or Newport News, at the Inter-American Company's option, to St. Lucia or Port of Spain, during the years 1914 and 1915, and that for such transportation the Inter-American Company should pay freight at the rate of $1.55 per ton. The paper contains various stipulations appropriate for such a contract, and in form is a complete contract."

The facts which, it is contended, evidence the making of such a contract, although the formal writing was not signed, may be thus summarized from the detailed narrative in the commissioner's report:

The head office of the Canadian Company was in Montreal; it had a branch office in Philadelphia, in charge of Mr. Stephens, its purchasing agent. The duty of finding business for and subchartering his company's chartered steamers had been delegated to him, and he had negotiated and signed many such contracts on behalf of his, principal. His authority to make such contracts was disputed on the argument, it being contended that, although he did sign a number of charters on behalf of the Canadian Company, it did not appear whether he had general authority to do so, or whether he did so by special authority in each case; it being suggested that the by-laws were not in evidence, nor any evidence shown of action by the board of directors. We are satisfied that a prima facie case was made out on the question of his entering into binding contracts of this sort; if the by-laws and the records of the company might impair the strength of this case, it was for libelant to show what they were.

Mr. Wrigley, of the New York & Porto Rico Steamship Company, shipbrokers, acting on behalf of the Inter-American Company, and Mr. Black, of Bowring & Co., shipbrokers, acting for the Canadian Company, had many interviews and telephone conversations in reference to a proposed contract. Black during these negotiations was in constant communication with Stephens and followed his instructions. The contract under negotiation was one whereby the Canadian Company, which had a number of chartered vessels that were available, should furnish tonnage to the Inter-American Company for the carriage of coal to Port of Spain and St. Lucia during 1914 and 1915. The Inter-American was under contract with the Royal Mail Steam Packet Company to supply it with coal at those places and required steamers to fulfill that contract. The negotiations began early in November, 1913. Not only the price, but also other terms, were subjects of discussion. On November 10th a rough memorandum was drawn up, noting some of these proposed terms—number of sailings, etc. On November 14th a somewhat fuller one was prepared, containing a noticeable change in the phraseology as to number of sailings. On No-

vember 11th Black wrote to Stephens at some length as to the requirements of the other negotiator. We are fully satisfied from the testimony that by November 17th both negotiators and Stephens personally had a reasonably definite understanding of what were to be the terms of the contract that Wrigley for the Inter-American would be willing to agree to. Of course, in all such contracts there are some clauses of a general character which negotiators presuppose will be included, without preliminary discussion. On November 17th, agreement was reached as to the rate per ton; Stephens authorizing an acceptance of the $1.55, which Wrigley had continually insisted on. Thereupon Wrigley prepared and delivered to Black a written contract bearing date November 17th, which the latter at once transmitted to Stephens informing him that it had just been handed him by Berwinds' broker for signature, and requesting him to "sign and return it, whereupon the customary number of copies would be issued." The document was a detailed one; it dealt with class of steamer, amount of service required, period covered by the contract, shipping ports, destination, rate of freight, shipments, rate of loading, rate of discharge, dispatch money, agency, stevedores, bunker coals, coal, form of charter party (inclosing a copy attached), option, commission, etc.

In reply Stephens wrote on November 19th acknowledging receipt of letter of "the 18th inclosing original contract," and adding:

"Before signing same there are one or two points we desire to take up with you."

These points he enumerates as follows:

"Dispatch Money. We note we are to allow dispatch money at the rate of 5 cents per net register ton for each and every lay day or part of lay day saved in discharging. We presume that the intention is that on parts of lay days saved that we will pay only a proportionate rate. Are we correct in this?

"We also note that the merchants have the option of stating what the amount of cargo will be; that is, between 2,500 and 3,600 tons. In the preliminary negotiations we did not understand it that way. Our understanding was that we could use steamers which would not carry less than 2,500 tons or more than 3,600 tons. As it now reads, it can be worked out to a great disadvantage to us. For instance, should we put the Trafalgar in, which steamer will be able to carry about 3,200 tons of coal, and they would not load more than 2,500 tons, you can readily see that we would be in a very bad position.

"Will you please explain these points to us and oblige."

This letter was signed in the name of the Canadian Company. Bowring & Co. replied to this on November 20th as follows:

"Dispatch Money. It is understood by merchants that this clause is intended to mean at the rate of 5 cents per net registered ton for each and every lay day or part of a lay day saved in discharging. The words 'at the rate of,' they tell us, are intended to mean the same as pro rata; that is, if there is part of a lay day saved, it is at the pro rata rate of 5 cents per net register ton per day.

"Regarding the amount of cargo, this is a mistake. It should read 'at time charterer's option,' and we shall be glad if you will change this accordingly."

When Bowring & Co. thus agreed to the only amendments suggested to the form of contract, the minds of the parties met and a contract was entered into. Moreover, we are of the opinion that the

Stephens letter of November 19th, which by reference incorporated in its text the full form of contract, constituted a "note or memorandum in writing" signed by the "lawful agent of the party to be charged," within the meaning of the statute of frauds. We are also inclined to the opinion that the libelant, a third party, cannot avail of this statute. Stitt v. Ward, 142 App. Div. 626, 127 N. Y. Supp. 351.

The next question to be considered is whether certain other facts negative the conclusion that the minds of the parties met on November 20th, so that a contract was then entered into.

Bowring & Co.'s letter of November 20th, above quoted from, concluded with the following paragraph (it may be noted the word "Berwinds" means the Inter-American Company):

"Berwinds have brought up the point about the signing of this contract, and request that same be signed by an officer of your company who is properly authorized to sign such contracts under your by-laws. They ask us to be sure to tell you that they in no way wish to hurt your feelings, but they recently had a coal contract which was signed by the purchasing agent of a company, and when that company got into difficulties it was shown that as purchasing agent that party had no authority to sign such contracts, as that company's by-laws only allowed certain officers of the company to sign. This being a two, option of three, year contract, they are anxious to have it properly signed, and we shall be obliged if you will see that the contract is properly signed as desired by them."

Thereupon the form of contract and letter were sent to Montreal for signature of the contract. The president of the company, Jones, refused to sign it, and made suggestions of several changes. A long correspondence ensued, the Inter-American trying to meet Jones' wishes in the matter. Finally he refused to sign it, even as modified, for the expressed reason that he doubted the Canadian Company's ability to carry it out. Shortly afterwards that company went into liquidation.

We do not agree with libelant's contention that the last quotation from Bowring & Company's letter indicates that Stephens had no authority to sign and that Bowring's client knew that he had not. All that it indicates is that, although the writer supposed Stephens had authority, he did not wish his parties, in the event of subsequent litigation, to be put to the trouble of proving such authority. The real and only question arising on this branch of the case is whether Stephens *did* have authority to make and sign such a contract. The evidence in this record shows that he did have authority, and, since he did, his principal was bound when his mind met with the mind of the other party as to the terms of the contract. Their minds did meet on November 20th when Stephens' only criticisms of the proposed form were accepted and agreed to, and contract was then entered into. We are not persuaded that defendant lost any of its rights under this contract, because subsequently it endeavored to reach some agreement with the president of the Canadian Company as to modification of some of its terms.

[2] One more question remains to be considered. The claim of the Canadian Company against the Inter-American for unpaid freight is a claim in admiralty. It is contended that, if it were being prosecuted

by the Canadian Company in an admiralty proceeding, defendant's claim for damages for breach of the contract above referred to could not be set off against it. Such is the practice in admiralty, and it sometimes will work injustice. For example, A., a person utterly insolvent, may have a valid claim justiciable in admiralty for $3,000 against B., who is entirely solvent, and who may hold a note of A. for $5,000 borrowed money, long past due. If A. sues in admiralty, he may obtain judgment for the $3,000 and collect it in full; the $5,000 due B. not being allowed as counterclaim or set-off. Judgment which B. might recover in some other court for the $5,000 will be worthless, since A. is insolvent.

A majority of the court are unwilling to extend this practice to a proceeding in admiralty where B. is brought in solely as a garnishee. We do not think the authorities require us to do so. Schuler v. Israel, 120 U. S. 506, 7 Sup. Ct. 648, 30 L. Ed. 707; North Chicago Rolling Mill v. St. Louis Ore Co., 152 U. S. 596, 14 Sup. Ct. 710, 38 L. Ed. 565; Thebideau v. Cairns (D. C.) 171 Fed. 233; Aktiesselskabet Borgestad v. Munson Steamship Line,[1] an opinion of Judge Hough holding that the sole question in garnishee proceedings is, how much does the garnishee owe to the respondent? in which holding a majority of this court fully concurs.

The decrees are reversed, with costs of appeal, one-half in each cause, and causes remanded, with instructions to dismiss the libels, with costs.

WARD, Circuit Judge (dissenting). I concur in the opinion of the court, except as to the extent of the garnishee's liability to the attaching creditor. The decree should be affirmed, because the amount due to the garnishee for charter hire to the respondent, $1,823.25, is not subject to any set-off or counterclaim in admiralty arising out of other independent transactions. The court cites two common-law cases, viz., Schuler v. Israel, 120 U. S. 506, 7 Sup. Ct. 648, 30 L. Ed. 707, which holds that the garnishee may set up any defense against the attaching creditor which he can set up against the defendant; and North Chicago Rolling Mill Co. v. Ore Co., 152 U. S. 596, 14 Sup. Ct. 710, 38 L. Ed. 565, which holds that the rights of the attaching creditor do not rise above those of his debtor. Now it is perfectly well settled, as indeed the court finds, that in the admiralty set-offs and counterclaims arising out of independent transactions are unknown. Benedict on Admiralty, § 392, and cases cited. This is recognized in Supreme Court rule in admiralty 53 as to cross-libels, which restricts them to cross-demands "arising out of the same cause of action." It follows from the cases cited by the court to the effect that the rights of the attaching creditor are exactly the same as, and no more and no less than, the rights of the defendant, that the garnishee cannot set up against the attaching creditor set-offs or counterclaims which he cannot set up against the respondent. Therefore the writ in this case covers the unpaid charter hire due by the garnishee to the respondent.

[1] See note at end of case.

As to the two admiralty decisions cited by the court, it is to be noted that in Thebideau v. Cairns (D. C.) 171 Fed. 233, the question does not seem to have been raised; certainly Judge Hale did not discuss it. In the case of Actieselsskabet v. Munson Line [1] Judge Hough says the sole question is, how much does the garnishee owe to the respondent? The question, I think, is not this at all, but how much can the respondent recover in a suit in admiralty against the garnishee? This sum, whatever it is, the writ of the attaching creditor covers.

### NOTE.

In the District Court of the United States for the Southern District of New York, per Hough, District Judge, in the cause entitled "Aktiesselskabet Borgestad, Owner of the Steamship Brynhild, Libelant, against Subcharter Hire Due Canadian Venezuelan Ore Company., Limited, from Munson Steamship Line, and against Canadian Venezuelan Ore Company., Limited, Munson Steamship Line, Garnishee," handed down an opinion as follows:

"The history of foreign attachment in admiralty is treated in Smith v. Mien, Fed. Cas. No. 13,081. It is an adaptation of civil law, not a borrowing from common law or the custom of London. The rule that a cross-libel must rest on or grow out of the same transaction as the one sued on in original libel rests in our Supreme Court rules. See United, etc., Co. v. N. Y. & Balt. Trans. Line, 185 Fed. 386, 107 C. C. A. 442. We have extended the cross-libel rule to set-offs. Emery v. Tweedie Trading Co. (D. C.) 143 Fed. 144.

"Now this libelant wishes to treat the garnishee as though he were a respondent pleading a set-off or counterclaim. This would be logical, if the garnishee were being sued by the libelant on a cause of action cognizable in admiralty. But a libelant need have no cause of action at all against a garnishee. He usually has none. This case is an example of the usual condition. The sole question in garnishee proceedings is, How much does the garnishee owe to the respondent? How much is owed is to be ascertained according to general rules of law; if conflict arises, civil law.

"The garnishee's exceptions are without merit. He has been allowed his real damage. All exceptions overruled. The correction in figures agreed on has been physically affixed to the commissioner's report."

---

[1] See note at end of case.