## THE ADA.

(Circuit Court of Appeals, Second Circuit. March 13, 1918.)

. No. 136.

1. ADMIRALTY ⬤⟳1—COURTS—JURISDICTION.
    A court of admiralty cannot retain jurisdiction to dispose of nonmaritime subjects, for the purpose of doing complete justice, after the manner of courts of equity.

2. ADMIRALTY ⬤⟳10—CONTRACTS—SALE OF VESSEL.
    Where a contract for the charter of a vessel gave the charterer an option to purchase the same for the sum specified in the charter party as the hire, the contract must be deemed one for the sale of the vessel, and so it was not one within the jurisdiction of a court of admiralty, and a proceeding in rem was not an appropriate remedy for breach.

3. ADMIRALTY ⬤⟳10—JURISDICTION—ENFORCEMENT OF CONTRACTS.
    A contract, enforceable in admiralty, must be wholly maritime.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Universal Transportation Company, Incorporated, against the steamship Ada, her engines, etc., claimed by the Rederiaktiebolaget Amie. From a decree for libelant (239 Fed. 363), claimant appeals. Reversed.

Engel Bros., of New York City, and Conlen, Brinton & Acker, of Philadelphia, Pa. (W. J. Conlen, of Philadelphia, Pa., and Van Vechten Veeder and Joseph G. Engel, both of New York City, of counsel, and J. T. Manning, Jr., of Philadelphia, Pa., on the brief), for appellant.

Kirlin, Woolsey & Hickox, of New York City (J. P. Kirlin and Cletus Keating, both of New York City, of counsel), for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

WARD, Circuit Judge. December 10, 1915, the respondent, the Amie Company, as owner of the Swedish steamer Ada, entered into an agreement with the libelant, the Universal Company, described as charterer. The steamer, then at sea, was chartered for about six months for the sum of $165,000, payable $40,000 down, $50,000 fifteen days after arrival, $45,000 three months thereafter with interest at 6 per cent. from the date of the agreement, $30,000 six months from the date of payment of the $45,000, with interest at 6 per cent. from the date of the agreement. The payments were subsequently changed, so as to make the second installment $60,000 and the last $20,000. The Universal Company was to pay all the expenses of running and maintaining the vessel, the risk of the loss of the vessel was on it, and it was to have the option of purchasing her for the price of $165,000 at

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

any time, the owner agreeing to deposit a bill of sale in escrow with the United States Mortgage & Trust Company as soon as possible.

January 25, 1916, the Universal Company notified the respondent that it would purchase the steamer and was ready to pay on receiving bill of sale. April 5 it tendered the purchase money to the defendant's attorneys and asked for a bill of sale, which was not delivered. April 6 the respondent, alleging that the Universal Company had failed to pay the installment of $45,000 on April 4, the day it was due, withdrew the steamer, which was then at sea on her way to New York, depriving the Universal Company both of the use of the vessel after arrival and discharge, as well as of the title. This action it justified on the ground that the contract required the Universal Company to pay the hire "punctually" i. e., on the due date—and gave the Amie Company, in case of its failure to do so, the right to withdraw the steamer "immediately." As soon as the Amie Company had discharged the cargo loaded by the Universal Company, it resumed complete and exclusive control of the vessel.

April 24 the Universal Company filed a libel against the steamer in rem and against the Amie Company in personam to recover the damages sustained by it, both for the breach of the charter and for breach of the contract of sale. May 3 and 4, 1916, the Amie Company filed exceptions to the libel, on the ground that the damages claimed arose from a breach of contract for the sale of the vessel, which was a cause of action not within the admiralty jurisdiction. May 8, 1916, the cause came on for trial before the exceptions were argued. The District Judge found that the Amie Company had wrongfully withdrawn the vessel, and was liable to the Universal Company for the loss sustained by it as charterer, but that the damages for breach of the contract of sale were not recoverable in admiralty. We shall dispose of the case on grounds which relieve us from the duty of considering the merits at all.

[1, 2] Evidently the whole controversy could have been disposed of in an action at law, but the jurisdiction of a court of admiralty is confined to maritime subjects. It cannot, having obtained jurisdiction, dispose of nonmaritime subjects, for the purpose of doing complete justice, after the manner of courts of equity, nor can it distribute funds in its possession, as do courts of equity and bankruptcy, among all creditors, preferred and general. Its power to dispose of the proceeds of a vessel, though it extends to the payment of nonmaritime liens, after maritime liens have been satisfied, does not extend to claims in personam or of general creditors, except so far as to pay over any surplus to the owner.

A charter party may, of course, contain covenants both maritime and nonmaritime, which in case of breach may be disposed of; the former either in the admiralty or at common law, and the latter at common law only. This charter party contains such nonmaritime covenants, namely, that of the Universal Company to buy the captain's chronometer for $200, and the ice box on the steamer for $250; for the breach of either of these covenants, no one, we suppose, would contend that suit could be maintained in the admiralty.

If this charter had provided for the use of the vessel for six months

at a specified charter hire, and had given the charterer the option thereafter to purchase at a fixed price, there would be two separate causes of action; the former justiciable either in admiralty or at law, and the latter at law only. But the right to use and the right to buy the steamer in this case were inseparably connected. The price for the use for six months was the same as the price for the absolute ownership. Obviously no one would fail to exercise such an option. All the provisions of the agreement show that the main intention was a contract of sale. Installments of so-called charter hire which were not practically paid down were to bear interest from the date of the agreement, and the charterer had a right to a bill of sale at any time upon paying the full charter hire. Certainly, as soon as the Universal Company exercised its option to buy and tendered the price, the contract became one of sale.

[3] It is well established that a contract enforceable in admiralty must be wholly maritime. Grant v. Poillon, 20 How. 162, 15 L. Ed. 871. In this case it was held that the master and part owner could not maintain a suit in admiralty for freight against shippers with whom he was a partner, because a partnership account would have to be settled. In Turner v. Beachem, Taney, 583, Fed. Cas. No. 14,252, Mr. Justice Taney held to the same effect, saying: -

"And I consider it to be a clear rule of admiralty jurisdiction that, although the contract which the party seeks to enforce is maritime, yet, if he has connected it inseparably with another contract over which the court has no jurisdiction, and they are so blended together that the court cannot decide one, with justice to both parties, without disposing of the other, the party must resort to a court of law, or a court of equity, as the case may require, and the admiralty court cannot take jurisdiction of the controversy. The case of Grant v. Poillon was decided upon this ground at the last term of the Supreme Court. 20 How. 162 [15 L. Ed. 871]."

The Pennsylvania, 154 Fed. 9, 83 C. C. A. 139, was our own decision and is very clear. The steamer Pennsylvania was demised to the charterer, who contracted to take young men on a described sea voyage, to occupy nine months, and at the same time put them through a course of study. He received large sums, prepaid, on account of these contracts, but never completed the alterations of the steamer or performed the contract in any respect. The parents of the young men having libeled the steamer, the owner, as claimant, objected that the contract, being one for education, as well as for transportation, was not within the admiralty jurisdiction. The District Judge held that it was, but dismissed the libel on the ground that the proceeding should have been in personam, and not in rem. We affirmed the decree, on the ground that there was no jurisdiction whatever in admiralty.

The decisions principally relied upon by the respondent are quite consistent with the foregoing: The Port Adelaide, 62 Fed. 486, 10 C. C. A. 505: The master of the vessel, whose whole capacity had been taken by the charterer, shipped cargo and collected freight on owner's account. This, of course, was a purely maritime transaction, and the charterer was held to have the right to adopt the contract as made for its benefit and to recover the amount. Gross v. New York & Texas Co. (D. C.) 107 Fed. 516: This was a libel to recover marine insur-

ance, which the carrier agreed in the bill of lading to take out for the benefit of the shipper.

Then there are cases of the distribution of funds in admiralty courts, as to which, except in the case of the owner, only lien creditors have any standing. The Lottawanna, 20 Wall. 201, 221, 22 L. Ed. 259; The Edith, 94 U. S. 518, 24 L. Ed. 167; The Guiding Star (C. C.) 18 Fed. 263; The Willamette Valley (D. C.) 76 Fed. 838; Benedict's Admiralty, § 5C6. These cases illustrate the difference between the powers of courts of equity and of admiralty. The former would have disposed of the claims of general as well as of lien creditors. Within the same principle fall cases where part owners disagree and the vessel is sold. The proceeds could not be distributed at all, unless accounts between the owners were settled. The John E. Mulford (D. C.) 18 Fed. 455; The Katie O'Neill (D. C.) 65 Fed. 111; The Emma B. (D. C.) 140 Fed. 771.

Other cases relied on are: The Electron, 48 Fed. 689, 21 C. C. A. 12; Id. (D. C.) 56 Fed. 304; Id., 74 Fed. 689, 21 C. C. A. 12: In this case the libel was filed to recover for maritime supplies, viz. electric batteries. The court did not pass at all on the question of patentability. Judge Brown held that notice that the batteries had been held to be an infringement in a patent suit was a defense to the owner against payment; whereas, we held that the notice of the decision alone did not amount to an eviction, though the claimant of the vessel would be entitled to a deduction for being deprived of the right to use the batteries. In Evans v. New York & P. S. S. Co. (D. C.) 145 Fed. 841, and 163 Fed. 405, the consignee of rubber sued the carrier and the warehouseman to whom the carrier had delivered the shipment to recover for a shortage. Exceptions were filed to the libel, on the ground that there was no maritime liability on the part of the warehouseman, which were overruled. When the case came on for trial, this view was not sustained, but the liability of the warehouseman, though nonmaritime, was made to depend on his obligation to indemnify the carrier. We are not able to approve this decision, which is the only one cited involving a nonmaritime claim. In the cases on which the court relied, Salisbury v. Seventy Thousand Feet of Lumber (D. C.) 68 Fed. 916, Burroughs was held liable for demurrage as charterer of the lighter, a purely maritime subject; in Dailey v. City of New York (D. C.) 119 Fed. 1005, and The Crown of Castile (D. C.) 148 Fed. 1012, the parties brought in were all liable upon maritime grounds. Finally, the case of Wilhelmsens v. Canadian Co., 224 Fed. 881, 140 C. C. A. 303, involved questions wholly maritime; the point decided being that a garnishee's right of set-off against the libelant's attachment was larger than the respondent's right of set-off against the libelant.

The decree is reversed.

ROGERS, Circuit Judge. I concur in the conclusion that the decree must be reversed. The jurisdiction of the admiralty courts is restricted to maritime subjects. The contract involved is plainly a contract of sale. For a contract to fall within the admiralty jurisdiction, it must concern transportation by sea, relate to navigation or

maritime employment, or be one of navigation and commerce on navigable waters. And the contract here does not come under any of these heads. The rule is settled that contracts for building a ship, or contracts for selling a ship, are not maritime contracts, and within the jurisdiction of the admiralty.

I also agree that courts of admiralty, having obtained jurisdiction, do not dispose of nonmaritime subjects, after the manner of courts of equity, for the purpose of doing complete justice. While admiralty courts act as courts of equity so far as their powers go, their powers are limited to maritime contracts or transactions, and they have no general jurisdiction to administer relief as courts of equity, or to administer complete relief. They differ, too, from the equity courts, in that they do not undertake to determine equitable rights.

I desire, however, to withhold any expression of opinion concerning certain cases referred to in the above opinion, and which do not seem to me to be involved in the matter now before the court.

HOUGH, Circuit Judge. In the result announced I concur; my reasons are somewhat different.

The rule that a contract, to be maritime, and therefore within admiralty jurisdiction, must be "wholly maritime," means that the principal subject-matter of agreement gives character to the whole. This construction of the phrase was adopted by this court in The Pennsylvania, 154 Fed. 9, 83 C. C. A. 139. Applying it to this case, I doubt whether the contract made had any of the marks of a charter except the name, but it is certain that in every essential it was an agreement to sell; the right to use pending payment was an incidental matter.

Further, since this appeal in admiralty is a new trial, we must consider the present situation of the parties, from which it seems plain to me that, in the common-law suit, libelants have recovered the value of the ship at date of breach, with interest, while their decree in admiralty represents loss of use of the same ship for a period subsequent to breach, and when, in contemplation of law, the value of the vessel was theirs, and they were earning interest upon such value. There is no difference, I think, in respect of damages for a total loss of vessel's use by collision, and the same loss by total breach of a contract such as this. The Hamilton (D. C.) 95 Fed. 844, and The Fontana, 119 Fed. 853, 56 C. C. A. 365, apply. The reasoning of The Philadelphia, 1917 Prob. 101, does not convince. Therefore, by recovering damages for loss of use in admiralty and interest on value at law, there has been a double recovery.

Apparently, from the bill of exceptions at law, interest on the verdict was allowed from a later date than that of breach; if this was a waiver of interest, because of the recovery in admiralty, it should make no difference. A party does not become entitled to something he has no legal right to, by waiving something less legally due him.

I also note a disagreement with the treatment of Evans v. New York, etc., Co. and Wilhelmsens v. Canadian Co., supra. Neither seem to me to have any relation to the case in hand, while if, by reference

to the Evans decision, it is meant to express the opinion that admiralty has no power to implead a surety or party responsible over, under the equity of the fifty-ninth rule (29 Sup. Ct. xlvi), I must dissent.