## PILLSBURY FLOUR MILLS CO. v. IN-TERLAKE S. S. CO.

### No. 259.

Circuit Court of Appeals, Second Circuit.

April 7, 1930.

Bigham, Englar, Jones & Houston, of New York City, and Brown, Ely & Richards, of Buffalo, N. Y. (Henry N. Longley, of New York City, Lawrence E. Coffey, of Buffalo, N. Y., and Ezra G. Benedict Fox, of New York City, of counsel), for appellant.

Dustin, McKeehan, Merrick, Arter & Stewart and George William Cottrell, all of Cleveland, Ohio, and Burke & Desmond, of Buffalo, N. Y. (Thomas C. Burke, of Buffalo, N. Y., and Carl A. Schipfer, of Cleveland, Ohio, of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

Appellant shipped a cargo of grain in good order and condition from Milwaukee, Wis., to Buffalo, N. Y., on appellee's steamer. In consideration of the freight paid, it was to be transported and delivered in as good condition as when shipped. The bills of lading provided for carriage and for "winter storage." The steamer sailed on November 5, 1927, and arrived at Buffalo on November 9, 1927, and anchored in the outer harbor under the breakwater, there to store her cargo of wheat for the winter months. The consignees were notified on November 9, 1927, that there was no report of damage to the cargo. The steamer was still in the Buf-

falo outer harbor April 7, 1928, and was towed to the elevator at Buffalo, and the cargo discharged in a damaged condition. Below it was held the suit was ex contractu in sustaining the exceptions filed to the libel and that the admiralty court was without jurisdiction.

The libel relies upon appellee's breach of contract to carry, store, and deliver the wheat in like good order and condition as when received. It charges a breach of a maritime contract. Dittmar v. Fred. Starr Contracting Co. (C. C. A.) 249 F. 437; Supreme Court Admiralty Rule 22. Each bill of lading provides: "Order of Pillsbury Flour Mills Company, Buffalo, N. Y.; For Winter Storage: Care of Island Warehouse Corporation, Buffalo, N. Y." And the court below held that the cargo was not to be delivered to the consignees in pursuance of the contract of carriage, but upon the completion of the voyage was to be held by the carrier as warehouseman only; that the maritime service of carriage had been performed, the liability as carrier ceased, and that of warehouseman commenced.

■■ The appellant argues that the contract is maritime and the subject of admiralty jurisdiction. A contract to be "'wholly maritime,' means that the principal subject-matter of agreement gives character to the whole." The Ada (C. C. A.) 250 F. 194, 198. In cases of contract, admiralty jurisdiction will attach if it has reference to a maritime service or maritime transaction. Insurance Co. v. Dunham, 11 Wall. 1, 20 L. Ed. 90; The Moses Taylor, 4 Wall. 411, 18 L. Ed. 397. In The Poznan, 9 F.(2d) 838, this court considered maritime liens in connection with wharfage charges. After reviewing the cases, we concluded that contract rights are maritime and within the admiralty jurisdiction when they relate to the ship as an instrument of commerce, and pointed out that a contract for the wharfage of a ship withdrawn from commerce is not maritime and will not support a maritime lien. In The Ada, 250 F. 194, 195, this court said:

"Evidently the whole controversy could have been disposed of in an action at law, but the jurisdiction of a court of admiralty is confined to maritime subjects. It cannot, having obtained jurisdiction, dispose of nonmaritime subjects, for the purpose of doing complete justice, after the manner of courts of equity, nor can it distribute funds in its possession, as do courts of equity and bankruptcy, among all creditors, preferred and general. Its power to dispose of the proceeds of a vessel, though it extends to the payment of nonmaritime liens, after maritime liens have been satisfied, does not extend to claims in personam or of general creditors, except so far as to pay over any surplus to the owner."

In The Richard Winslow (C. C. A.) 71 F. 426, 428, a contract was made near the close of the season of navigation on the Great Lakes, for the shipment of a cargo of grain from Chicago to Buffalo, the grain to be stored in the vessel at Buffalo until the following Spring. The vessel proceeded on her voyage, arrived safely at the port of Buffalo in November, 1893. When her hatches were opened and her cargo examined, it was found to be in as good order and condition as at the time of shipment. The hatches were then put on and covered with tarred paper and canvas covers. The schooner was moored at the place designated by the shippers or their agents in the harbor. While thus stored in the ship, the cargo was damaged. The libel sought recovery for the loss, and the Circuit Court of Appeals for the Seventh Circuit held that the contract was not within the cognizance of admiralty, and that the liability of the owners at the time of the injury was that of warehousemen. The court said:

"Unquestionably there was here a contract for carriage by sea, and that contract was maritime in its nature. But there was joined with it a contract with respect to the cargo after the completion of the voyage that was in no respect maritime in its nature. If as Judge, now Mr. Justice, Brown observes in The Pulaski [D. C.] 33 F. 383, the storage were a mere incident to the transportation, the entire contract would be held to be maritime, and within the admiralty jurisdiction. But here the contract for holding the corn in storage did not concern navigation. It could not take effect until after completion of the voyage, and had no relation to further transportation of the cargo by the vessel. It was to be performed at a time when the vessel was not engaged in commerce or navigation, or in preparation therefor. It was merely a contract for winter storage, and was no more maritime in its nature than the nonmaritime contracts for winter wharfage. * * * The reason is that such service does not pertain to the navigation of a ship, nor assist a vessel in the discharge of a maritime obligation."

■■ These bills of lading embody a dual contract, one for transportation and the other

for storage, and a breach of that contractual obligation which is nonmaritime may not be the subject of a suit in admiralty. The Pulaski (D. C.) 33 F. 383; The Richard Winslow, supra; The Poznan, supra. When the cargo arrived at Buffalo and came to anchor in the outer harbor, under the agreements contained in the bills of lading, the maritime service of carriage ended and the appellee then became a warehouseman for the grain. See Southern Ry. v. Prescott, 240 U. S. 632, 36 S. Ct. 469, 60 L. Ed. 836. The contract of carriage contained a provision that the grain consigned upon payment of freight was to be delivered on out-turned weight. The vessel encountered some heavy weather on her trip down but the grain, upon examination of insurance underwriters, was found not to have been damaged on arrival at the anchorage inside the breakwater. It was found, when the cargo was delivered April 7, 1928, that serious damage had been done to the grain. The libel pleads a breach of contract, not a negligent act. There was a constructive delivery and a termination of the maritime liability of the vessel on her arrival at her anchorage. At that time, the initial liability of the carrier changed to that of warehouseman.

When the cargo was moved in the spring for unloading, the relationship of that of warehouseman was not changed so as to constitute a maritime undertaking. The contract, being partly maritime and partly nonmaritime, did not confer the right to invoke maritime jurisdiction under the circumstances here existing. The Ada, supra. The Jungshoved (C. C. A.) 290 F. 733, to which we are referred by the appellant, involved the employment of a lighter by a steamship to unload a cargo, and the lighter sank in calm weather before the delivery of its cargo. The question involved was whether the vessel had secured a seaworthy lighter for storage in the harbor pending delivery of the merchandise, and the steamer was held liable. Delivery could not be made by the vessel when it arrived because of the crowded condition of the wharf, and the storage was but temporary. James Shewan & Sons v. United States, 266 U. S. 108, 45 S. Ct. 45, 69 L. Ed. 192, involved a libel for the value of repairs made to the steamship owned by the United States. The libel alleged that the vessel was in maritime trade and that the lien upon the vessel for repairs was one which ordinarily could be enforced in admiralty by proceeding in rem against the vessel. On exceptions filed, it appeared that the vessel was laid up and out of use and anchored in the river for a considerable length of time. The court considered the Suits in Admiralty Act of 1920 (41 Stat. 525 [46 US CA §§ 741–752]), which was intended to substitute the equivalent remedy against the United States in personam for the right in rem against its merchant vessels permitted by the Shipping Board Act of 1916 (39 Stat. 728 [46 USCA §§ 801–834, 31 USCA § 745, note]), and held that, construing the two acts together, it did not mean that the merchant vessel must be actively employed at such time when the action is commenced; that, if the vessel was previously engaged in mercantile trade and so engaged when the cause of action arose, the mere fact that she was laid up and out of use when the action in personam began did not prevent a suit in admiralty. Other cases referred to, where libels were sustained, involving suits for personal injuries, are not in point. In Keyser v. Blue Star S. S. Co. (C. C. A.) 91 F. 267, 271, to which we are also referred by appellant, a libel was filed by the owners of a foreign vessel against a charterer to recover for overcharge in a draft for expense money advanced to the master in the port of loading under a clause of the charter party requiring such advances at current rate of exchange. The answer alleged that the charges were made in accordance with the established custom of the port in regard to such drafts and the rate of exchange thereon, and the court held, on exceptions, that the answer stated a good defense; the current rate of exchange as expressed being always a matter of proof. There the admiralty court had jurisdiction because of the provision in the charter party, as one of the stipulations and an essential part of the contract, that the charterer was required to advance expense money to the master of this foreign vessel at the port of loading, and for this the master gave drafts on the owners. The court said:

"It is true that the mere fact of this agreement being embraced in the charter party would not of itself give it the character of a maritime contract; but its relation to the other stipulations of the charter party may be such (and, we think, appears to be such) as to connect it with the contract into which the parties were entering,—a contract of an undisputed maritime character,—and in such a manner as to authorize the parties to apply to a court of admiralty to inquire into any alleged breaches of this stipulation."

See New Bedford Co. v. Purdy, 258 U. S. 96, 42 S. Ct. 243, 66 L. Ed. 482; Gonsalves v. Morse Dry Dock Co., 266 U. S. 171, 45 S. Ct. 39, 69 L. Ed. 228; London Guarantee & Accident Co., Ltd., v. Industrial Accident Comm. of Cal., 279 U. S. 109, 49 S. Ct. 296, 73 L. Ed. 632; Northern Coal & Dock Co. v. Strand, 278 U. S. 142, 49 S. Ct. 88, 73 L. Ed. 232.

The principle of the cases of The Pulaski, supra, and The Richard Winslow, supra, has long settled the rule of obligation under a contract involving both carriage and storage during the winter months on the Great Lakes. No authoritative decision has been called to our attention which requires our refusing to follow these authorities. The facts before us for consideration do not differ materially from those considered in these cases.

The decree is affirmed.