OCEAN BENIGNITY LTD., Plaintiff,

v.

OCEAN MARITIME CO., LTD. and S1
Maritime Co., Ltd., Defendants.

No. 09 Civ. 1324 (DAB).

United States District Court,
S.D. New York.

April 3, 2009.

Anne Casey LeVasseur, Charles Edmund Murphy, Lennon, Murphy & Lennon, LLC, New York, NY, for Plaintiff.

*MEMORANDUM & ORDER*

DEBORAH A. BATTS, District Judge.

On February 13, 2009 Plaintiff Ocean Benignity Ltd., ("Ocean Benignity") a foreign corporation of Hong Kong, brought suit against Defendants Ocean Maritime Co., Ltd. ("Ocean Maritime") and S1 Maritime, foreign corporations with their principal place of business in Seoul, South Korea. Plaintiff's Verified Complaint alleges that Defendants breached a Memorandum of Agreement between the parties and seeks $6,702,910.00 in damages and an Order directing the Clerk to issue a Maritime Attachment and Garnishment in the same amount, as well as an Order appointing process server. For the reasons stated herein, the request for an Order of

Maritime Attachment and Garnishment is DENIED.

## I. BACKGROUND

On or about June 11, 2008, Plaintiff and Defendant Ocean Maritime entered into a Memorandum of Agreement ("The Agreement") for the sale of the vessel "Ocean Benignity" ("the Vessel") by Plaintiff in exchange for a purchase price of $15,800,000.00 from Ocean Maritime. (Compl. Exh. 1, ("The Agreement"), ¶ 1); (Compl. ¶ 6.)

Under the Agreement, Ocean Maritime was to pay a security deposit of 10% of the purchase price within three banking days of the signing of the Agreement. (Agreement, ¶ 2); (Compl. ¶ 7.)

In Paragraph 4 the Agreement provided under "Inspection" that "Buyers have waived their right to physically inspect the vessel and have accepted her class records with recommendations fully therefore they confirm accept the vessel's condition so this Agreement is made definite and outright strictly basis 'as is where is.'" (Agreement, ¶ 4.) This typed-in provision replaced in its entirety the boilerplate language of the Agreement's Paragraph 6, "Drydocking/Divers Inspection," which the parties crossed out completely. (Agreement, ¶¶ 4, 6.)

Under Paragraph 5, "Notices, time and place of delivery," the Vessel was to be delivered to buyer at a date between Octo-

ber 1 and November 15, 2008, at the seller's option. (Agreement, ¶ 5.)

In Paragraph 8, "Documentation," the Agreement incorporated an Addendum creating a schedule for the parties' delivery of documents to each other under the Agreement. (Agreement, Addendum No. 1.) This Addendum was dated September 15, 2008.

The Agreement also provided in Paragraph 11 under the heading "Condition on delivery" that the Vessel "shall be delivered and taken over *strictly basis 'as is where is.'* However, the Vessel shall be delivered with her class maintained with two outstanding recommendations ..." [1] (Agreement ¶ 11) (emphasis original). The recommendations for the buyer to carry out after delivery were for the repair of "the deformed lower brackets ... in twin deck space of No. 1 cargo hold" and "the denting area of ... bulkhead in twin deck space of No. 1 cargo hold." (Agreement, ¶ 11.)

The Agreement provided that it was to be construed in accordance with English law and that any disputes arising out of the Agreement would be referred to arbitration in Hong Kong. (Agreement, ¶ 16.)

The Agreement also included an incorporated boilerplate rider, which states that the buyer may, at its option, inspect the "under-water parts of the vessel" and if damage that affects the vessel's class is discovered, then the seller will either com-

---

1. A "recommendation" in the context of vessel repair and certification arises when, "[d]uring the course of a classification society survey, the surveyor [ ] detect [s] items of concern. In such a case, the surveyor will make recommendations evidenced by visas on the ship's record. If the problem is severe and poses an immediate threat to the seaworthiness of the vessel, classification may be terminated or suspended until the shipowner complies with the surveyor's recommendation. If the threat presented by the deficiency is less immediate, the surveyor may afford the shipowner a period of time to correct the deficiency. If the defect is not corrected before the expiration of this grace period, classification will be withdrawn or suspended unless a further extension is granted." *Liability of Classification Societies from the Perspective of United States Law*, Machale A. Miller, 22 Tul. Mar. L.J. 75, 81 (1997). In this case, the time period for correction ended on January 14, 2009. (Agreement, ¶ 11.)

pensate buyer for the repair of that damage or repair the damage at its own expense. (Agreement, ¶ 18). This would seem to contradict the explicit language of the parties set forth in Paragraph 4.

On June 13, 2008, S1 Maritime issued a Letter of Guarantee in which it "guarantee[d] unconditionally and irrevocably the performance of Ocean Maritime ... as the Buyers for the fulfillment and/or performance of all and/or any of their obligations under the Memorandum of Agreement for sale and purchase of "Ocean Benignity." (Compl. ¶ 8; Compl. Ex. 2. ("Letter of Guarantee"))

On October 20, 2008 the parties signed an Addendum No. 2 to the Memorandum of Agreement, (Compl. Exh. 3, ("Addendum No. 2")), which, in its preamble stated that "[d]ue to financing problems the Buyer has ... as a favor tendered by the Seller upon the Buyer's request for finishing the transaction and closing the account friendly and smoothly," agreed to Addendum No. 2. (Addendum No. 2, Preamble.)

Addendum No. 2 provided that Ocean Maritime would release the 10% deposit and Plaintiff would pay Ocean Maritime a commission of $1,000,000.00 to be deducted from the balance of the Vessel price upon delivery. (Addendum No. 2, ¶¶ 1–3); (Compl. ¶ 10.)

Under Paragraph 5 of Addendum No. 2, Ocean Maritime was to reconfirm that it would take delivery of the Vessel by January 14, 2009, at which time the Vessel would be delivered in the same condition and with the same safety certifications as originally described in the Agreement. (Addendum No. 2, ¶ 5); (Compl. ¶ 12.)

However, Addendum No. 2 also provided that "[in] case the Buyer failed in reconfirming [a delivery date of January 14, 2009,] the Seller shall then be free to have the vessel docked and repaired as it is required by her class ..." at buyer's expense. (Addendum No. 2, ¶ 6); (Compl.

¶ 13.) Thus, for the first time, the option of repairs by Plaintiff at Defendant's expense appeared, if Defendant did not reconfirm delivery by January 14, 2009.

On December 1, 2008, Ocean Maritime sent a message to Plaintiff stating that it was unable to secure financing and would not be able to take delivery of the Vessel by January 14, 2009. (Compl. Exh. 4; Compl. ¶ 14.) Ocean Maritime also instructed Plaintiff to proceed with docking and repairing the Vessel pursuant to Addendum No. 2. (Compl. Exh. 4; Compl. ¶ 14.) Subsequently, on January 14, 2009, Ocean Maritime again informed Plaintiff that it remained unable to obtain financing and would thus be unable to take delivery of the Vessel pursuant to the Agreement. (Compl. Exh. 5; Compl. ¶ 15.)

Plaintiff incurred costs of $482,910.00 in repairing the Vessel, and Defendants have not reimbursed Plaintiff for the costs of repairs or for the remaining purchase price of the Vessel. (Compl. ¶ 16.) As a result. Plaintiff alleges that after deducting Ocean Maritime's deposit and commission, as well as the present fair market value of the ship, it has been damaged in the amount of $6,702,910.00. (Compl. ¶ 19.)

## II. DISCUSSION

### A. Legal Standard

 "[I]n addition to meet[ing] the filing and service requirements of Rules B and E, an attachment should issue if the plaintiff shows that (1) it has a valid prima facie admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law bar to the attachment." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,* 460 F.3d 434, 445 (2d Cir.2006). Additionally, in considering the first of these factors, where a maritime claim is alleged to

arise under contract law, "because pre-judgement attachment is such a severe remedy, it is important to first determine whether a contract is, in fact, a maritime contract warranting maritime attachment." *Williamson v. Recovery Ltd. Partnership,* 542 F.3d 43, 48 (2d Cir.2008).

Here, Plaintiff has made a sufficient showing of three of the four *Aqua Stoli* factors. Plaintiff's counsel avers that the Defendants cannot be found within this District and that, upon information and belief, the "Defendants have, or will have during the pendency of this action" property within the District in the hands of garnishee banks. (Compl. ¶ 26) Additionally, Plaintiff has made no indication of any statutory or maritime law bar to an attachment. Plaintiff's contract claim, (*see* Compl. ¶ 21), however, is not a maritime claim warranting a maritime attachment.

### B. *Contracts for the Sale of a Vessel.*

Until very recently it has been the un-contested rule in the Second Circuit that a contract for the sale of a vessel is not a maritime contract. *See e.g., The Ada,* 250 Fed. 194 (2d Cir.1918); *Vrita Marine Co., Ltd. v. Seagulf Trading LLC,* 572 F.Supp.2d 411 (S.D.N.Y.2008).

■ However, in *Kalafrana v. Sea Gull Shipping Co. Ltd.,* 591 F.Supp.2d 505 (S.D.N.Y.2008), the Court found that the "broad language" in *Norfolk Southern Railway Co. v. James N. Kirby Pty Ltd.,* 543 U.S. 14, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004), and *Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.,* 413 F.3d 307, 314 (2d Cir.2005), "support[s] the demise of the holding" that a contract for the sale of a vessel may not constitute a maritime contract. The Court in *Kalafrana* noted that when a "ship that has been plying the seas for some time" is purchased, "the sole purpose of [that] ship is to sail" and the "fundamental interest giving rise to maritime jurisdiction—the protection of maritime commerce—requires a vessel, sailors, and ship fuel." *Kalafrana,* 591 F.Supp.2d at 509. Therefore, the Court found that "there is simply no justification for including contracts for the latter two requirements in admiralty jurisdiction while excluding contracts for the former." *Id.*

Here, Plaintiff asks the Court to follow *Kalafrana,* and find that a contract solely for the purchase of a vessel falls within what it contends is the expanded scope of maritime jurisdiction after *Kirby* and *Folksamerica.* The Court agrees that this could very well be the next logical step for the Second Circuit to take. The Circuit has not however yet done so.[2]

### C. *Mixed Contracts*

In the alternative, Plaintiff argues that because among the damages it seeks are the costs of repairing the Vessel to make it seaworthy and thus capable of maritime commerce, the Court should find that "[b]ecause admiralty jurisdiction would undoubtedly exist if [Plaintiff] had entered into a vessel repair contract alone, there is

---

**2.** Other district court decisions have found, even after *Kirby* and *Folksamerica,* that an agreement for the sale of a vessel does not create a maritime contract. *See e.g., Aggelikos Prostatis Corp., v. Shun Da Shipping Group Ltd.,* No. 08 Civ. 9094, 2009 WL 249241 at *4 (S.D.N.Y. Feb. 2, 2009) ("To the extent that the language in *Kalafrana* can be read to support the argument that after *Kirby* and *Folksamerica,* a contract providing only for the sale of a vessel falls within the admi-ralty jurisdiction, the reasoning of *Kalafrana* is contrary to well-established persuasive precedent."); *Unicorn Bulk Traders Ltd., v. Fortune Maritime Enterprises, Inc.,* No. 08 Civ. 9710, 2009 WL 125751 at *2 ("The Court decline[s] to follow *Kalafrana* for several reasons. First, the Second Circuit has explicitly held that breach of a contract to sell a vessel does not give rise to maritime jurisdiction. Until the Second Circuit overrules that precedent, this Court is obliged to follow it.")

no intuitive reason why the same repairs ... fail to do so if undertaken pursuant to a sales agreement." *Kalafrana Shipping, Ltd.,* 591 F.Supp.2d at 510–11 (internal citations omitted).

Federal Courts have recognized two exceptions to the general rule that admiralty jurisdiction is "reserved to contracts, claims, and services purely maritime." *Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.,* 413 F.3d 307, 314 (2d Cir.2005) (quoting *Rea v. The Eclipse,* 135 U.S. 599, 608, 10 S.Ct. 873, 34 L.Ed. 269 (1890)). The first such exception covers mixed contracts that "arise[ ] from a breach of maritime obligation that are severable from the non-maritime obligations of the contract." *Id.* (internal quotations omitted). Here, there is no allegation by Plaintiff that its contract claim falls under this exception. The second exception was until recently described as creating jurisdiction where the non-maritime elements of a contract were "merely incidental" to the maritime ones. *Id.* However, the Second Circuit has recently recognized that the Supreme Court's decision in *Kirby* refashioned the contours of that exception. *Folksamerica Reinsurance Co.,* 413 F.3d at 314. In *Kirby,* the Supreme Court examined a contract for the sale of goods, and held that whether that agreement gave rise to a maritime claim hinged upon whether the contract, despite a provision providing for the carriage of goods over both sea and land, had as its "primary objective ... the transportation of goods by sea." *Id.* (quoting *Kirby,* 125 S.Ct. at 393). Therefore, following the language of *Kirby,* the Second Circuit expanded the exception for mixed contracts to those cases where "the principal objective of a contract is maritime commerce." *Id.* at 315.

The Court in *Kalafrana* noted in the alternative, that even if one were to read *Kirby* and *Folksamerica* "as limited to cases involving mixed contracts, there is admiralty jurisdiction over claims" where the agreement had two objectives, at least one of which was to repair the vessel. Here the Plaintiff argues that since its alleged damages arise from both the sale and repair of the Vessel, it too should gain the benefit of the exception for mixed contracts whose principal objective is maritime commerce.

■ However, the Court finds that the facts of this case are sufficiently distinguishable from those in *Kalafrana* to make that case inapposite here. The Court finds that the repairs contemplated for the first time by Addendum No. 2 to the Agreement were at best a penalty clause to encourage Defendant to fulfill the sales contract at the "as is" price originally contemplated by the parties, and therefore the repairs clause was a conditional tail wagging the sales contract dog, and not a mixed contract falling within the maritime jurisdiction of the Court. Furthermore, because the underlying Agreement is not a mixed contract within the maritime jurisdiction of the Court, Plaintiff's claim against S1 Maritime, the guarantor of the Agreement, similarly lacks a basis for maritime jurisdiction.

#### i. *The Agreement*

As an initial matter, the Agreement expressly disclaims repairs, providing that the Vessel "shall be delivered and taken over *strictly basis 'as is where is'* ... with her class maintained with two outstanding recommendations ..." (Agreement, ¶ 11) (emphasis original). In contrast, the Agreement in *Kalafrana,* which utilizes the same "Saleform 1993" boilerplate agreement, states under the "Conditions on delivery" section that the Vessel shall be "delivered with her class maintained ... *free of recommendations or defects* which if known would at any time result in class recommendations being imposed."

*Kalafrana Shipping Ltd. v. Seagull Shipping Co. Ltd.*, Docket No. 08 Civ. 5299, Document No. 23–2 at ¶ 11 (the "Kalafrana Agreement"). Therefore, while the Kalafrana Agreement provides for the repair of the vessel to the point of compliance with its class, without recommendations or defects, the present Agreement expressly disavows the repair of "the deformed lower brackets . . . in twin deck space of No. 1 cargo hold" and "the denting area of . . . bulkhead in twin deck space of No. 1 cargo hold" prior to delivery of the Vessel. (Agreement at ¶ 11.)

While the Agreement's incorporated rider provides that the buyer may, at its option, inspect the "under-water parts of the vessel" and if damage that affects the vessel's class is discovered, then the seller will either repair or compensate buyer for the repair of that damage, (Agreement at ¶ 18), this clause directly contradicts Paragraph 4 of the Agreement, which states that "[b]uyers have waived their right to physically inspect the vessel" and that they "accept the vessel's condition so this Agreement is made definite and outright strictly basis "as is where is." (Agreement at ¶ 4).[3] Thus, the original Agreement does not provide for the repair of the Vessel.

ii. *Addendum No. 2*

The structure and language of Addendum No. 2 demonstrate that any repairs contemplated therein were merely a penalty clause contingent on buyer's failure to confirm delivery. According to Addendum No. 2, it was only "[in] case the Buyer failed in reconfirming [a delivery date of January 14, 2009, that] the Seller shall then be free to have the vessel docked and repaired as it is required by her class . . ." (Addendum No. 2, ¶ 6). Thus, reimbursement for the docking and repairs under Addendum No. 2 was intended to penalize the Defendant in the event that it did not confirm its intent to perform under the original Agreement and thus provide and incentive for it to do so.

Furthermore, Addendum No. 2 itself states in its preamble that "[d]ue to financing problems the Buyer has . . . as a favor tendered by the Seller upon the Buyer's request *for finishing the transaction and closing the account friendly and smoothly*, it is further and mutually agreed . . . that . . ." (Addendum No. 2, at 1) (emphasis added). Hence, according to its own language, Addendum No. 2 was drafted and entered into for the sole objective of encouraging and advancing the stalled performance of the Vessel's sale under the original Agreement. *See Gaster Marine Recovery & Sales, Inc. v. M/V The Restless I*, 33 F.Supp.2d 1333, 1335 (S.D.Fla., 1998) (finding that although contracts for ship repair normally fall within federal admiralty jurisdiction, the instant contract was not maritime because "the repairs were undertaken to advance the sale of the [vessel] pursuant to the parties' [sales] Agreement.")[4]

Finally, a simple calculation shows that the price sought for the Vessel ($15,800,-

---

3. Even if the express language of Paragraph 4 had not nullified Paragraph 18, the Agreement would not constitute a mixed contract, because any repairs under Paragraph 18 were to be completed *at the expense of the seller*. Thus, unlike *Kalafrana*, where the buyer compensated the seller for the repair of the vessel, under Paragraph 18, such repairs would have been carried out by the seller at no additional cost to the buyer.

4. Furthermore, it is doubtful whether subject matter first included in an addendum, months after an underlying agreement was signed, can ever be the primary objective of that agreement. For if the content of the addendum were indeed the primary objective of the agreement under *Folksamerica* and *Kirby*, then almost by definition it would have been included in the original agreement. Additionally, such use of addenda to insert maritime provisions into non-maritime contracts,

000.00) was more than 30 times greater than the cost of repairs ($482,910.00) that were undertaken by Plaintiff pursuant to Addendum No. 2. This substantial disparity further undermines any plausibility to the claim that the repairs were a "primary objective" of the contract rather than a mere penalty clause added to advance the performance under the original agreement.

Because under clear Second Circuit precedent a contract for the purchase of a vessel is not maritime in character, and because it is not credible that the contingent repair of the Vessel was a primary objective of the Agreement, even with the addition of Addendum No. 2, Plaintiff has no prima facie maritime claim against Defendant Ocean Maritime Co., Ltd. Similarly, because the underlying Agreement is not maritime in character, the Letter of Guarantee provided by Defendant S1 Maritime Co. to Plaintiff guaranteeing performance under the Agreement does not give rise to a maritime claim. For these reasons, the request for an Order of Maritime Attachment and Garnishment is DENIED.

## III. Conclusion

Because Plaintiff has not made out a prima facie maritime claim, the Court DE-

NIES its request for an Order of Maritime Attachment and Garnishment.[5]

SO ORDERED.

---

months after an agreement was formed, would enable parties to bootstrap their contract disputes into maritime claims for the purpose of obtaining an attachment against a non-performing party.

5. Although the Court finds no basis in maritime law for federal jurisdiction under 28 U.S.C. § 1333, the Complaint seeks recognition and confirmation of a foreign arbitration award under 9 U.S.C. §§ 201 *et seq.* The jurisdictional provision of that statute, § 203, states that "district courts of the United States ... *shall have original jurisdiction* over [an action or proceeding falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201], regardless of the amount in controversy."

(emphasis added). The U.S. Court of Appeals for the Second Circuit has set forth the basic requirements for a dispute that "falls under" the Convention: (1) there must be a written agreement; (2) it must provide for arbitration in the territory of a signatory of the convention; (3) the subject matter must be commercial; and (4) it cannot be entirely domestic in scope. *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 92 (2d Cir.1999) (citing 9 U.S.C. § 202). Because the Agreement provides for arbitration in Hong Kong, China, a signatory to the convention, and because the subject matter is clearly commercial, and not domestic in scope, Plaintiff has federal jurisdiction under 9 U.S.C. § 203.